















JPP    3/19/02    13:36
3:02-CV-00513   BORDER POWER PLANT V. DEPARTMENT OF ENERGY
*1*
*CMP.*

ORIGINAL

1  JULIA A. OLSON  (Cal. Bar # 192642)
   JAMIE B. JEFFERSON (Cal. Bar # 197142)
2  Wild Earth Advocates
   370 Grand Ave., Suite 5
3  Oakland, CA 94610
   Tel – 510-663-2868
4  Fax – 510-663-2869

5  MARTIN WAGNER (Cal. Bar # 190049)
   Earthjustice Legal Defense Fund
6  426 17th Street
   Oakland, CA 94612
7  Tel - 510-550-6700
   Fax - 510-550-6740
8

9  Counsel for Plaintiff
   BORDER POWER PLANT WORKING GROUP
10

11              IN THE UNITED STATES DISTRICT COURT

12          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14  BORDER POWER PLANT WORKING     )   Case No. 02 CV 5131EG (JAH)
    GROUP,                         )
15                                 )
                                   )
16            Plaintiff,           )   COMPLAINT FOR DECLARATORY AND
                                   )   INJUNCTIVE RELIEF
17       v.                        )
                                   )   (National Environmental Policy Act, 42
18  DEPARTMENT OF ENERGY; SPENCER  )   U.S.C. §§ 4321 et seq.)
    ABRAHAM, in his official capacity; CARL  )
19  MICHAEL SMITH, in his official capacity;  )
    ANTHONY J. COMO, in his official capacity;  )
20  BUREAU OF LAND MANAGEMENT,     )
                                   )
21                                 )
                                   )
22            Defendants.          )
    _____
23

24

25

26

27

28

COMPLAINT                                                    -1-

## INTRODUCTION

1.     This action is brought under the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* ("NEPA"), its implementing regulations and the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* Plaintiff challenges the Department of Energy's ("DOE") December 2001 Environmental Assessment ("EA") for Presidential Permit Applications for Baja California Power, Inc. ("BCP") and Sempra Energy Resources ("Sempra"), the December 2001 Finding of No Significant Impact ("FONSI") and the resulting two Presidential Permits, Order Nos. PP-234 and PP-235.

2.     The Presidential Permits that were evaluated in the EA, and ultimately issued, allow two companies incorporated under the laws of the United States to build electric transmission lines in California that cross the international border with Mexico, enabling the same companies (or their parent company) to export power to California from power plants (hereinafter collectively "border power plants") they are constructing in the Mexicali region of Mexico, three miles south of the international border. The turbines being constructed in Mexicali for export are being built only to supply the United States with power and their ability to do so hinges on the DOE's issuance of these two Presidential Permits. The ability of these border power plants to export power to the United States also hinges on a reliable fuel source. Under the proposed action, DOE assumes that the border power plants would be fueled by natural gas imported from the United States via a not yet approved, nor constructed, North Baja Pipeline, also requiring a Presidential Permit. In sum, this project as a whole is about the export of natural gas from the United States to two American corporation-constructed power plants in Mexico for the production of power that will be exported from the Mexico-based power plants to the United States for American consumption.

3.     In addition to generating power for export to California, the American corporations will also generate significant amounts of pollution and other environmental impacts that will affect California. At the same time, by constructing the plants just south of the border, the companies evade compliance with the environmental protection laws of the United States. The border power plants will emit pollutants to Southern California's Salton Sea Air Basin,

COMPLAINT                                                                                            -2-

which is already in non-attainment under the federal Clean Air Act, 42 U.S.C. §§7401 *et seq.* The border power plants will also discharge wastewater with high concentrations of pollutants that will further impair the New River and the Salton Sea, California waterbodies that already violate the water quality standards in the federal Clean Water Act, 33 U.S.C. §1251 *et seq.*, and are therefore designated by the State of California as "water quality limited" under that Act. These air and water impacts cumulatively threaten the health of humans, wildlife and the environment of California.

4.      In its EA and FONSI, DOE failed to adequately consider, disclose and evaluate these potentially significant impacts. DOE also failed to consider, disclose and evaluate any alternative to the proposed action. Finally, DOE failed to prepare an EIS to address the individual and cumulatively significant impacts of the proposed action and the connected action of the North Baja Pipeline project.

5.      Plaintiff brings this action to ensure that the federal government complies with NEPA and its implementing regulations by considering, analyzing and disclosing all of the environmental impacts associated with and any reasonable alternatives to the proposed action.

JURISDICTION

6.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 as this action arises under the laws of the United States.

7.      An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a). This Court may grant declaratory relief and additional relief, including and injunction, pursuant to 28 U.S.C. §§ 2201, 2202 and 5 U.S.C. §§ 705, 706.

8.      The December 5, 2001 issuance of the FONSI and the two Presidential Permits constitutes the final administrative determination of the Department of Energy related to the Presidential Permit applications by Sempra and BCP. Final agency action exists that is subject to this court's review under the APA. 5 U.S.C. § 702.

9.      Venue lies in this judicial district by virtue of 28 U.S.C. § 1391(e) because the events or omissions giving rise to the claim arise, and the plaintiff is located, in this district.

PARTIES

10. Plaintiff BORDER POWER PLANT WORKING GROUP ("BPPWG") is a coalition of nonprofit public interest groups and citizens in both the United States and Mexico who are concerned with and affected by the environmental impacts from an ever-increasing concentration of power plants situated along the international border with Mexico. BPPWG was formed to monitor the proposed power plant projects, to ensure full public disclosure of potential environmental impacts, to ensure involved public participation and to use political, economic, legal and other tools to ensure that power plants constructed along the international border meet environmental standards which are necessary to safeguard human health in BPPWG members' communities. BPPWG recognizes that the air quality along the international border is generally poor and that water is in short supply. Thus, it seeks to advance the use of available technologies to minimize and offset air emissions, minimize water use and minimize wastewater generation from power plants. BPPWG and its members are actively involved in local, regional, national and international governmental and regulatory processes concerning power generation along the U.S.-Mexico border, and the resultant impacts on air and water quality and other biological and ecological resources.

11. The Border Ecology Project ("BEP") is one participating member of the BPPWG. BEP is a private non-profit organization, based in southeastern Arizona along the international border, which advocates for solutions to environmental problems specific to the U.S.-Mexico border and, to a lesser extent, the interior of Mexico and other parts of Latin America. BEP's staff, board of directors and members consist of both U.S. and Mexican residents who are concerned with environmental issues as part of broader social dynamics in the border region.

12. Members of BPPWG live and work in Imperial Valley. Their health and well-being depends in large part on the health of the water and air and the productivity of surrounding ecosystems, including public lands, which comprise at least 50 percent of Imperial Valley. Every minute of every day, members of BPPWG breathe the air in Imperial Valley, which is contaminated with carbon monoxide, particulate matter, nitrogen oxides and ozone. BPPWG members also observe, study, recreate or otherwise enjoy the biologic, scientific, and aesthetic

benefits of Imperial Valley, including the project area. Members especially enjoy the benefits of the New River and the Salton Sea Wildlife Refuge, within Imperial Valley.

13.     The health, recreational, scientific, cultural, inspirational, educational, aesthetic and other interests of plaintiff have been and will be adversely and irreparably injured by defendants' failure to comply with NEPA and its implementing regulations, unless the relief requested here is granted.  These are actual, concrete injuries to plaintiff that would be redressed by the relief sought.  Plaintiff has no other adequate remedy at law.

14.     In order to safeguard its interests, BPPWG has actively participated with the local, regional and federal governmental entities' regulatory processes.  Specifically, BPPWG participated in the formal public comment period for the EA.  It has also written numerous letters to government officials regarding the border power plants.

15.     Defendant UNITED STATES DEPARTMENT OF ENERGY is the agency responsible for issuing the Presidential Permits at issue here, Order Nos. PP-234 and PP-235.

16.     Defendant SPENCER ABRAHAM is the Energy Secretary and is sued in his official capacity.

17.     Defendant CARL MICHAEL SMITH is the Assistant Secretary for Fossil Energy, as of February 5, 2002, and is sued in his official capacity.  Defendant Smith's predecessor, ROBERT S. KRIPOWICZ signed the FONSI.

18.     Defendant ANTHONY J. COMO is the Deputy Director of Electric Power Regulation Office of Coal & Power Import & Export, Office of Coal & Power Systems, Office of Fossil Energy, and is sued in his official capacity.  Defendant Como issued the Presidential Permits to SEMPRA and BCP.

19.     Defendant BUREAU OF LAND MANAGEMENT is the agency responsible for protecting and managing the public lands at issue here and is a cooperating agency on the EA.

## FACTS

### Background

20.     A large number of power plants are currently planned or are under construction in Mexico within the "border region" near the United States.  In most cases, these power plants are

being constructed in air basins that are shared by both countries and are in non-attainment with U.S. and Mexican ambient air quality standards for ozone, particulate matter less than 10 microns in diameter (PM10), and carbon monoxide (CO). These new plants would add air pollution to regions that are already suffering from levels of pollution that are considered hazardous to human health. In addition, these power plants would use a wet condensate cooling technology that requires the intake of enormous quantities of water, resulting in massive evaporation and water loss in an arid region. The wastewater discharged from these power plants would contain high concentrations of salts (total dissolved solids or TDS). The air and water resources impacts from "border power plants" will not only affect Mexicans, but will cross the border and affect the environment of residents of the United States.

21. Imperial County, in the southeastern corner of California, is a border region particularly impacted by the proliferation of border power plants. It is bordered on the west by San Diego County, on the north by Riverside County, on the east by the Colorado River which forms the Arizona boundary, and on the south by the 84 miles of International Boundary with Mexico. Approximately 50 percent of the county is undeveloped and under federal ownership. Approximately seven percent of the county is covered by the Salton Sea. The entire county is within the Salton Sea Air Basin, which also includes a portion of Riverside County. The U.S. Environmental Protection Agency ("EPA") has determined that the Salton Sea Air Basin is a non-attainment area for state and federal ozone standards and PM10, and that part of the basin is in non-attainment for CO standards. This non-attainment status triggers requirements for New Source Review and Conformity Review analyses. The conformity review requires, among other things, that federal actions conform to the provisions of the State Implementation Plan under the Clean Air Act.

22. The Salton Sea Wildlife Refuge is the largest body of water in Imperial County, with an estimated 7,400,000 acre-feet of water. The Salton Sea is a terminal lake with no outlet to the ocean. The Salton Sea receives its water from the Alamo River, the New River and agricultural drains. Nearly one-third of the Salton Sea's inflow comes from the New River in Mexico. Total annual inflow to the Salton Sea is approximately 1,363,000 acre-feet, which is

approximately equal to the water evaporation rate of the Salton Sea. The Salton Sea Wildlife Refuge is home and habitat for over 400 species of birds. In some years, as many as 95 percent of the total population of eared grebes, 80 percent of the American white pelicans, 50 percent of ruddy ducks, and 40 percent of the American population of Yuma clapper rails may use the Salton Sea. Nearly 40 percent of California's breeding by black skimmers takes place at the Salton Sea, and the Sea's nesting colony of gull-billed terns is the largest in the western United States. The Salton Sea is home to many sensitive species. In 1998, the State of California Regional Water Quality Control Board for Region 7 ("RWQCB") listed the Salton Sea as an impaired water body under section 303(d) of the Clean Water Act. Among other pollutants, the Salton Sea is listed as an impaired water body because of its salinity. The RWQCB also listed the New River, which feeds the Salton Sea, as a 303(d) impaired water body. Increasing salinity of the Salton Sea threatens its ability to act as habitat for the approximately 400 species of birds that visit or permanently reside at the Salton Sea Wildlife Refuge.

23.     Currently, two new border power plant complexes are under construction in Mexicali, a region that is approximately three miles south of the United States-Mexico border, and approximately 16 miles southwest of El Centro, Imperial County, California. Sempra Energy Resources ("Sempra"), a corporation under the laws of the United States, began construction of the Termoelectrica De Mexicali Facility ("Sempra Plant") in 2001. InterGen, also a corporation under the laws of the United States, began construction of La Rosita Power Complex ("InterGen Plant") in 2001.

24.     Once constructed, the Sempra Plant will consist of two turbine sets that are intended to export 600 megawatts of energy to the United States. The Sempra Plant is a speculative "merchant plant," being constructed solely to meet projected increased power demand in the United States. The Sempra Plant will not provide any power to Mexico.

25.     The InterGen Plant will be located one and one-half miles east of the Sempra Plant. Once constructed, the InterGen Plant will consist of four turbine sets with a combined output of 1060 megawatts. Two of the turbine sets would provide 560 megawatts of energy to the United States. The other two turbine sets would provide 500 megawatts of energy to Mexico,

though under certain market conditions at least a portion of the power produced for the use in Mexico could be marketed to the United States.

26.     The ability of the Sempra and InterGen Plants to export power to the United States depends upon the construction of electric power transmission lines from the international border with Mexico to the Imperial Valley Substation owned and operated by San Diego Gas and Electric Company.  A DOE Presidential permit is required before transmission lines may be constructed across the U.S. border.  DOE has the legal authority to approve, condition, or deny the issuance of a Presidential permit.

27.     Thus, Sempra and BCP, a subsidiary of InterGen, applied to the DOE for Presidential permits to construct, operate, maintain, and connect electric power transmission facilities between the Imperial Valley Substation, in Imperial County, California, and transmission lines that would be constructed on the Mexican side of the international border, leading to the border power plants being constructed by Sempra and InterGen respectively. Sempra and BCP each sought separate Presidential Permits to construct individual transmission lines extending approximately six miles south from the Imperial Valley Substation, across public lands managed by the Bureau of Land Management, to the U.S.-Mexico border.  The Sempra-owned lines would import power from the Sempra Plant.  The BCP-owned lines would import power from the InterGen Plant, its parent company.

28.     In addition to importing power from the Mexicali power plants, the transmission lines would also serve as a conduit to export power from the United States to the Sempra and InterGen Plants.  The plants require the importation of power from the United States to initiate their generation capacities.  For example, they require the power from the United States to begin operation of the cooling towers.  The plants would also import power from the United States to provide "black start" capability, i.e., any start-up of the plants when they are not generating electricity to supply their own needs.  The plants would also import power from the United States to provide ancillary equipment power when the plants' electrical generating equipment does not operate, such as during weekend plant shutdowns.

29.     The Department of Energy and the Department of Interior, through the Bureau of Land Management, jointly prepared an Environmental Assessment ("EA") ostensibly to consider, analyze, and disclose the environmental impacts of the proposal to issue the Presidential permits to Sempra and BCP.  The EA considers only the two proposed transmission line applications as "the project."  The Final EA, FONSI and two Presidential permits were all issued on December 5, 2001.

30.     The Sempra and InterGen Plants are proposed to be constructed as natural gas-fired power plants.  The ability of the Sempra and InterGen Plants to operate as natural gas power plants requires the importation of natural gas to the plants from a reliable source. To that end, both companies propose to import natural gas from the United States via a not yet permitted, nor constructed, pipeline called the "North Baja Pipeline."  The InterGen Plant will also have the ability to fire diesel as a back-up fuel if natural gas is temporarily unavailable.

31.     The North Baja Pipeline is a joint venture between Sempra and PG&E.  The North Baja Pipeline, if constructed, would be a 79.9 mile pipeline system extending from an existing natural gas pipeline in Arizona to an existing pipeline in Baja California, Mexico, crossing the international border at Algodones, Mexico.  The North Baja Pipeline would transport up to 500 million cubic feet per day of natural gas to the international border.  Another Presidential Permit is required to construct and operate the North Baja Pipeline at the international border for the exportation of natural gas to Mexico.

32.     If the North Baja Pipeline is not constructed to supply natural gas to the Sempra and InterGen Plants, the plants would have to obtain an alternative fuel source in order to operate and export power to the United States.  Sempra and BCP assert that there are two other "technically feasible" potential sources for natural gas, which would require additional construction of pipelines and/or system upgrades, lengthy approval processes, and delays.  In addition, the supplies from these alternative sources may be unreliable, causing curtailments in the operation of the plants, and economically infeasible.  BCP has stated that if natural gas through the North Baja Pipeline was unavailable, the InterGen Plant could burn diesel fuel supplied by Pemex.  BCP has stated that this option is disfavored because emissions would be

substantially higher than emissions from combusting natural gas. However, BCP considers this an alternate method of operating its plant if the North Baja Pipeline is not constructed. Sempra also has not eliminated diesel fuel as an optional fuel source for its plant. Both Sempra and BCP believe that the proposed North Baja Pipeline fuel source is the cleanest, most efficient and most economical fuel source available for the power plants.

33.     In July 2001, FERC and the Bureau of Land Management issued a Draft Environmental Impact Statement and Draft Land Use Plan Amendment for the North Baja Pipeline Project. In January 2002, the Final EIS was issued. The proposed action evaluated in the EIS is the construction and operation of a new natural gas transmission pipeline system from Arizona across the U.S.-Mexico border. A Record of Decision has not been issued. The Presidential permits have not been issued. None of the other approvals necessary for the project has been made.

34.     In its formal comments on the EA for the cross-border transmission lines, U.S. EPA told DOE that the proposal to issue permits for the transmission lines is a "connected action" to the proposal to issue permits for the North Baja Pipeline. As connected actions, EPA advised that pursuant to NEPA, the full scope of the cumulative environmental impacts from these interdependent actions (which include the proposed power plants) should be comprehensively evaluated. No comprehensive evaluation has been performed.

Impacts of the Proposed Project

35.     The potential impacts from the import of power from the Sempra and InterGen Plants in Mexicali to California via the Sempra and BCP transmission lines are environmentally significant. At a minimum, they include potentially significant adverse impacts to air quality, water quality, the Salton Sea wildlife refuge and its inhabitants, the New River and human health.

36.     In generating power for the United States, both the Sempra and InterGen Plant emissions would cause an increase in the amounts of nitrogen oxides (NOx), CO, $PM_{10}$, ozone and other pollutants in the Salton Sea Air Basin. Emissions generated at these plants will cross the international border, moving into the airshed of Imperial County. The EA estimates that in

producing power to export to the United States on the permitted transmission lines the Plants will generate 452 tons of NOx, 1,089 tons of CO and 626 tons of PM10 annually.  These emissions exceed the "significance levels" for net emission increases established by the EPA in its regulations under the Clean Air Act.  The two turbines destined to provide power primarily to Mexico will emit an additional 1,502 tons of NOx, 957 tons of CO and 314 tons of PM10 annually.  Oxides of nitrogen (NOx) contribute to the formation of ozone and inhalable particles in the atmosphere.  The Salton Sea Air Basin already contains pollutants at levels deemed unsafe for human health.  Thus, the basin is in non-attainment status for PM10, ozone and in some places CO.  The additional influx of pollutants, directly resulting from the United States' importation of power from the plants in Mexico, will exacerbate already harmful levels of pollutants and make it even more difficult for the U.S. air quality districts in the border region to attain compliance with clean air standards.

37.     Already, Imperial County has the highest rate of hospitalization for children with asthma of any county in California. Ozone impedes lung growth in children and aggravates respiratory illnesses.  PM10 has been linked to premature death in people with heart and lung ailments.  CO impairs cognitive functions and high levels of this pollutant can also be life threatening for individuals with heart or lung disease.

38.     If the Sempra and InterGen Plants were constructed in California, they would be considered "new sources" of pollution under the Clean Air Act.  "New sources" are required to use the best available conventional technology ("BACT") to control and minimize emissions of pollutants. In the United States, the plants would also be required by EPA to offset emissions of non-attainment pollutants in the non-attainment areas.  However, apparently because these new plants are sited just three miles across the American-Mexican border, neither the FONSI, nor the Presidential Permits require that BACT be used, or that the American corporations building the plants provide any offsets for emissions of non-attainment pollutants in non-attainment areas. Based upon information disclosed in the EA, neither Sempra nor InterGen/BCP will provide offsets for emissions of non-attainment pollutants in non-attainment areas.  Based upon information in the EA, Sempra intends to use BACT for controlling NOx and CO emissions at

the Sempra Plant. Based upon information in the EA, InterGen intends to use BACT for controlling NOx on the two export turbines at the InterGen Plant, but will not use BACT for controlling CO emissions and will not use BACT on the turbines to supply power to Mexico.

39.    The EA underestimates the potential environmental impacts from these methods of exporting power to the United States. For example, the EA fails to evaluate in any meaningful way the impact of the project's emissions' sources on downwind ozone levels, possibly one of the most significant impacts of the project. In fact, the EA's entire discussion of ozone is inconsistent with current scientific knowledge. Even relatively low ambient concentrations of NOx can be quite influential in producing high ozone concentrations in the Salton Sea Air Basin of Southern California and there is a high potential for short-duration, high ozone formation in that region. The EA ignores significant short-term impacts and focuses only on impacts to ozone levels on an annual basis. Also, the modeling used by DOE to estimate certain impacts to air quality failed to take into account the potential emissions from the project as a whole. If the Sempra and InterGen Plants use natural gas to generate power for export to the United States and if they actually construct the Plants with some of the emission-control technology described above, the impacts on air quality will still be significant.

40.    The potential impacts from air pollution that would be generated at the border power plants is far worse than the EA analyzed or disclosed. The EA assumes, without basis, that the turbines at the Sempra and InterGen Plants will run on natural gas. In fact, the entire impacts analysis hinges on the assumption that the exclusive fuel for the plants will be natural gas. However, it is reasonably foreseeable that at least one of the plants will use diesel fuel to produce electricity. BCP, InterGen's subsidiary, stated that the InterGen Plant would consider using diesel fuel from Pemex if it was unable to obtain natural gas via the North Baja Pipeline.

41.    The FONSI does not require the plants to operate on natural gas. The Presidential Permits do not require the plants to operate on natural gas. In its EA, DOE analyzed no alternatives in which the proposed electric transmission lines would connect to a diesel-powered plant to import power to the United States. Yet, it is possible that at least one of these plants will

be fueled with diesel, and consequently generate significantly increased air emissions that will move into the Salton Sea Air Basin above Imperial County.

42.     The cumulative air impacts from other sources than the turbines that would export power to the United States have not been adequately evaluated by DOE. In the EA, DOE only considers the impacts of the "export turbines" in making a finding that there will be no significant impact. DOE does not consider the cumulatively significant impacts on air quality of other new sources of air emissions in the area, including the two turbines being constructed as part of the InterGen plant to provide power to Mexico. The combined emissions from natural gas burning plants will exceed EPA's established "significance levels" for non-attainment areas.

43.     The Air Pollution Control District of Imperial County formally commented on DOE's proposal to issue the Presidential Permits to Sempra and BCP. The Air District believes that the emissions resulting from the project would have significant adverse impacts on the air quality in the Salton Sea air basin. The Air District confirms that the emissions will exacerbate the non-attainment ozone and $PM_{10}$ status of the region. Similarly, the California Air Resources Board formally commented that the issuance of the Presidential permits would result in significant adverse impacts to the air quality of the region and requested the preparation of an EIS. EPA also commented that it was concerned about the potentially significant impacts to air quality from the two new power plants in Mexicali because of their contribution of emissions to airsheds that are in non-attainment with National Ambient Air Quality Standards and Mexican air quality standards.

44.     The adverse impacts to water quality arise from the Plants' use of wet condensate cooling technology instead of dry cooling technology. The Plants intend to use wastewater from the Zaragoza wastewater treatment facility in Mexicali (Mexicali I) for their power generation operations. After use by the Plants, the wastewater, diminished significantly in quantity, but with an increased concentration of pollutants (total dissolved solids or TDS), would be discharged to drainage channels that enter the New River in Mexico. The New River flows north, crosses the international border, and eventually ends in the Salton Sea in California. The decrease in quantity of surface water reaching the Salton Sea, combined with discharges of high

concentrations of TDS, will result in increased salinity of an already impaired water body. This impact is significant individually and cumulatively. Experts project that within 20 to 40 years, the Salton Sea may be too saline for many of the 400 species of birds that use the Sea as breeding, feeding, migrating and other habitat. Increasing salinification threatens to permanently destroy one of the most important bird sanctuaries in the United States. This project will contribute to that end. In addition, the overall concentration of parameters for which the New River is "water quality limited" under Section 303(d), specifically sediment, pesticides, nutrients, bacteria, and volatile organics, will increase as a result of the proposed action. The power plants will take water that is currently treated by an existing Mexicali I wastewater treatment plant and evaporate most of this water (up to 80 percent) in the power plant cooling towers. The effect of this rate of evaporation will be to reduce the overall flow of the New River by as much as 10 to 12 percent, without reducing the flow or concentration of the predominant untreated wastewater discharge entering the New River from the Mexicali II collection system. The result will be an increase in the concentration of the parameters for which the New River is water quality limited.

45.    The U.S. EPA has invested nearly 20 million dollars in grant funding to improve the Mexicali wastewater collection and treatment system so that the quality of freshwater flow from the New River, which eventually reaches the Salton Sea, would be improved. Thus, previously funded mitigation measures could be for naught if significant flows are redirected to the power plants for cooling and never enter the New River.

46.    In the EA, DOE evaluated only one action alternative, the proposed project. It also considered a "no action" alternative. The EA dismissed without evaluation alternative locations for the proposed transmission lines as unreasonable.

47.    DOE should have considered other reasonable alternatives to issuing the Presidential Permits as proposed in the only action alternative. For example, it should have considered an alternative that conditioned the issuance of the Presidential Permits on transmission lines that connected to natural gas powered plants, which used selective catalytic reduction for NOx control and oxidation catalyst for CO control, provided offsets for all remaining emissions and used dry-cooling technology with zero wastewater discharge, or any

combination thereof.  The lack of a range of alternatives prevented the public and the decision-makers from being able to evaluate in comparative form the impacts of the proposed action.

48.    Executive Order 10485, as amended, requires that Presidential Permits be issued only after a finding that they are consistent with the public interest.  A finding of consistency with the public interest requires a full evaluation and consideration of environmental impacts.  Executive Order 10485, as amended, also gives the issuing agency the authority to attach to any Presidential Permit and to the exercise of the rights granted thereunder any conditions necessary to protect the public interest.

## FIRST CAUSE OF ACTION

### NEPA:  DOE Failed to Prepare an EIS

49.    Plaintiff hereby realleges and incorporates paragraphs x through x, above.

50.    NEPA, 42 U.S.C. § 4332(2)(c), and its implementing regulations require all federal agencies to prepare an EIS for all major projects significantly affecting the quality of the human environment.

51.    The FONSI and decision notice to issue the Presidential Permits to SEMPRA and BCP constitute a major federal action significantly affecting the human environment within the meaning of 42 U.S.C. § 4332(2)(c).  The federal defendants violated 42 U.S.C. § 4332(2)(c) by failing to prepare an Environmental Impact Statement that discusses all relevant impacts and effects of the project.

52.    If a required DOE EA does not support a FONSI, DOE shall prepare an EIS and issue a ROD before taking action on the proposal addressed by the EA.  10 C.F.R. § 1021.322.  DOE violated its own regulations implementing NEPA by issuing a FONSI when the EA did not support a finding of no significant environmental impact.  *See also* 10 C.F.R. § 1021, Subpt. D, App. D.

53.    Defendants failed to consider cumulatively significant impacts on the environment and failed to prepare an EIS when it was reasonable to anticipate a cumulatively significant impact on the environment.  40 C.F.R. §§ 1508.27(b)(7); 1508.25(a).  When the proposed agency action is related to other actions, which might together have a cumulatively

significant impact, the "significance" of the impact to the human environment, "cannot be avoided by . . . breaking it down into small component parts." *Id.* Cumulative impacts are those that result from the "incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

54.     The impacts of issuing the Presidential Permits for the construction, operation and maintenance of the electrical transmission lines must be evaluated in terms of the cumulative effects of it and other environmentally adverse impacts in the area.

55.     An EIS is required even if the significant impacts are short term and even if defendants believe that on balance the effect will be beneficial. 40 C.F.R. § 1508.27.

56.     Defendants failed to take into account the degree to which the effects on the quality of the human environment are likely to be highly "controversial" in determining the "significance" of the effects of the action for the purpose of ascertaining whether or not to prepare an EIS. 40 C.F.R. § 1508.27. There is significant controversy over the cumulative impacts of issuing the Presidential Permits to Sempra and BCP.

57.     Defendants failed to take into account the "unique" characteristics of the geographic area, such as the Salton Sea Wildlife Refuge, in determining the "significance" of the effects of the action in deciding whether or not to prepare an EIS. 40 C.F.R. § 1508.27(b)(3).

58.     Defendants failed to account for the precedential value of this decision for other similar projects, which will cumulatively have a significant environmental impact. 40 C.F.R. § 1508.27(b)(6).

59.     Defendants did not give consideration to the likelihood that the project would threaten a violation of federal, state, or local law. 40 C.F.R. § 1508.27(b)(10).

60.     Defendants failed to prepare an EIS to fully evaluate potentially significant impacts to air and water quality, wildlife, public safety and human health.

## SECOND CAUSE OF ACTION

### NEPA:  The transmission line and North Baja Pipeline Presidential permits Are Connected Actions That Should Have Been Comprehensively Evaluated in an EIS

61.    Plaintiff hereby realleges and incorporates paragraphs x through x, above.

62.    Actions are deemed connected actions and must be discussed in the same EIS if they trigger other actions which may require an EIS, if they will not proceed unless other actions are taken previously or simultaneously or if they are interdependent parts of a larger action.  40 C.F.R. § 1508.25.

63.    The project addressed in the EA should have been analyzed in a comprehensive EIS that evaluated all connected actions including the border power plants themselves and the North Baja Pipeline project.

64.    DOE and BLM failed to consider, analyze and disclose the environmental impacts of connected actions in one EIS.

<u>THIRD CAUSE OF ACTION</u>

<u>NEPA:  The EA is Inadequate</u>

65.    Plaintiff hereby realleges and incorporates paragraphs x through x, above.

66.    NEPA requires that federal agencies consider all reasonable alternatives to their proposed actions.  Agencies must, "study, develop and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E); 40 C.F.R. §§ 1501.2(c), 1507.2.

67.    The CEQ regulations specifically require that an agency issuing an EA "[s]hall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(e) of the environmental impacts of the proposed action and alternatives."

68.    40 C.F.R. § 1502.14 requires an agency to explore all reasonable alternatives, and provide an explanation for eliminating reasonable alternatives from study.

69.    Even reasonable alternatives not within the jurisdiction of the lead agency shall be considered.  40 C.F.R. § 1502.14(c).  Appropriate mitigation measures not already included in the proposed action shall be considered.  40 C.F.R. § 1502.14(f).

70. Impacts of reasonable alternative should be presented in comparative form, "thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14.

71. Defendants failed to consider, evaluate and disclose reasonable alternatives that would avoid or minimize adverse impacts or enhance the quality of the human environment and still satisfy the purpose and need for the project. 40 C.F.R. § 1502.1.

72. NEPA also requires an agency to consider, analyze and disclose the environmental impacts of the proposed action, cumulative impacts of the proposed action and the impacts of connected actions. The EA fails to adequately consider, analyze and disclose impacts to the environment from the proposed action.

## FOURTH CAUSE OF ACTION

### Violation of the Administrative Procedure Act

73. Plaintiff hereby realleges and incorporates paragraphs x through x, above.

74. The Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, entitles a party to seek judicial review of an agency action where a legal wrong is alleged and the party alleging the violation is adversely affected or aggrieved by the agency action. Pursuant to 5 U.S.C. § 706, a reviewing court shall hold unlawful and set aside agency action found to be arbitrary, capricious, or otherwise not in accordance with the law, and should compel agency action illegally withheld or unreasonably delayed.

75. Defendants' failure to comply with NEPA and its supporting regulations constitutes arbitrary and capricious agency action, is an abuse of discretion, and is contrary to law and to procedures required by law. 5 U.S.C. § 706(2)(A), (D).

## RELIEF REQUESTED

WHEREFORE, Plaintiff requests that this Court issue:

1. A judgment declaring that the EA, FONSI, and Decision Notice and Presidential Permits fail to comply with the procedures and requirements of NEPA, 42 U.S.C. §§ 4321-4370(d) and the CEQ regulations, 40 C.F.R. §§ 1500-1517.7.

2.    A judgment declaring that the defendants violated the APA, 5 U.S.C. § 706(2), by acting arbitrarily, capriciously, in an abuse of discretion, not in accordance with the law and/or without observance of procedures required by law.

3.    A judgment and order setting aside the illegally issued Presidential Permits pending the preparation and issuance of an EIS that complies with NEPA.

4.    A judgment and order for costs of suit herein, including attorneys fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 or other authority; and

5.    For such other and further relief as the court deems proper and just.

Respectfully submitted this 16th day of March, 2002.

Julia A. Olson
Jamie B. Jefferson
Martin Wagner
Attorneys for Plaintiff
Border Power Plant Working Group

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

**I (a) PLAINTIFFS**  Border Power Plant Working Group

**DEFENDANTS**  U.S. Department of Energy
Spencer Abraham
Anthony J. Como
Carl Michael Smith
U.S. Bureau of Land Management

FILED

02 MAR 19 AM 11: 24

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF**   San Diego
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**
Julia A. Olson
Wild Earth Advocates
370 Grand Avenue, Suite 5
Oakland, California 94610
510-663-2868

Martin Wagner
Earthjustice
46 17th Street
Oakland, California 94612
510-550-6700

**ATTORNEYS (IF KNOWN)**

'02 CV   513 IEG   (JAH)

**II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)**

| | |
|---|---|
| 1 U.S. Government Plaintiff | 3 Federal Question (U.S. Government Not a Party) |
| 2 U.S. Government Defendant | 4 Diversity (Indicate Citizenship of Parties in Item III) |

**III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX**
(For Diversity Cases Only)  FOR PLAINTIFF AND ONE BOX FOR DEFENDANT

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated or Principal Place of Business in This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated and Principal Place of Business in Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

**IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)**

Plaintiffs allege Defendants violated the National Environmental Policy Act, 42 U.S.C. 4321, in their reviewable final agency actions approving a finding of no significant impact and issuing presidential permits for the construction and operation of transmission lines that cross the border into Mexico.

**V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)**

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 610 Agriculture | 422 Appeal 28 USC 158 | 400 State Reapportionment |
| 120 Marine | 310 Airplane | 362 Personal Injury- Medical Malpractice | 620 Other Food & Drug | 423 Withdrawal 28 USC 157 | 410 Antitrust |
| 130 Miller Act | 315 Airplane Product Liability | 365 Personal Injury - Product Liability | 625 Drug Related Seizure of Property 21 USC881 | **PROPERTY RIGHTS** | 430 Banks and Banking |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | | 630 Liquor Laws | 820 Copyrights | 450 Commerce/ICC Rates/etc. |
| 150 Recovery of Overpayment &Enforcement of Judgment | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 640 RR & Truck | 830 Patent | 460 Deportation |
| 151 Medicare Act | 340 Marine | **PERSONAL PROPERTY** | 650 Airline Regs | 840 Trademark | 470 Racketeer Influenced and Corrupt Organizations |
| 152 Recovery of Defaulted Student Loans (Excl. Veterans) | 345 Marine Product Liability | 370 Other Fraud | 660 Occupational Safety/Health | **SOCIAL SECURITY** | 810 Selective Service |
| 153 Recovery of Overpayment of Veterans Benefits | 350 Motor Vehicle | 371 Truth in Lending | 690 Other | 861 HIA (1395ff) | 850 Securities/Commodities Exchange |
| 160 Stockholders Suits | 355 Motor Vehicle Product Liability | 380 Other Personal Property Damage | **LABOR** | 862 Black Lung (923) | 875 Customer Challenge 12 USC |
| 190 Other Contract | 360 Other Personal Injury | 385 Property Damage Product Liability | 710 Fair Labor Standards Act | 863 DIWC/DIWW (405(g)) | 891 Agricultural Acts |
| 195 Contract Product Liability | | | 720 Labor/Mgmt. Relations | 864 SSID Title XVI | 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 730 Labor/Mgmt. Reporting & Disclosure Act | 865 RSI (405(g)) | 893 Environmental Matters |
| 210 Land Condemnation | 441 Voting | 510 Motions to Vacate Sentence Habeas Corpus | 740 Railway Labor Act | **FEDERAL TAX SUITS** | 894 Energy Allocation Act |
| 220 Foreclosure | 442 Employment | | 790 Other Labor Litigation | 870 Taxes (U.S. Plaintiff or Defendant) | 895 Freedom of Information Act |
| 230 Rent Lease & Ejectment | 443 Housing/Accommodations | 530 General | 791 Empl. Ret. Inc. Security Act | 871 IRS - Third Party 26 USC 7609 | 900 Appeal of Fee Determination Under Equal Access to Justice |
| 240 Tort to Land | 444 Welfare | 535 Death Penalty | | | 950 Constitutionality of State |
| 245 Tort Product Liability | 440 Other Civil Rights | 540 Mandamus & Other | | | 890 Other Statutory Actions |
| 290 All Other Real Property | | 550 Civil Rights | | | |
| | | 555 Prisoner Conditions | | | |

**VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)**

X 1 Original Proceeding   2 Removal from State Court   3 Remanded from Appellate Court   4 Reinstated or Reopened   5 Transferred from another district (specify)   6 Multidistrict Litigation   7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:**   CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23   DEMAND $   Check YES only if demanded in complaint:
JURY DEMAND:   YES   NO

**VIII. RELATED CASE(S) IF ANY (See Instructions):**   JUDGE   Docket Number

DATE  3-15-02

SIGNATURE OF ATTORNEY OF RECORD  *Julia A. Olson*

::ODMA\PCDOCS\WORDPERFECT\22816\1 January 24, 2000 (3:10pm)

RD #150 RD 3/19/02  VG #80634