1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   BORDER POWER PLANT WORKING              CASE NO. 02CV513  IEG (POR)
     GROUP,
12                                           Order (1) Denying Plaintiff's Motion
                              Plaintiff,     for Summary Judgment, (2) Granting
13                                           Federal Defendants' Cross-Motion for
                                             Summary Judgment, (3) Granting
14                                           Defendant-Intervenor Termoelectrica
                                             U.S.'s Cross-Motion for Summary
15                                           Judgment, (4) Granting Defendant-
                                             Intervenor Baja California Power's
16         vs.                               Cross-Motion for Summary Judgment,
                                             (5) Granting in Part, Denying in Part
17                                           All Defendants' Motions To Strike the
                                             First Declaration of William E.
18                                           Powers, (6) Granting in Part, Denying
                                             in Part Plaintiff's Motion To Strike the
19                                           Declaration of Octavio M.C. Simoes,
                                             (7) Granting in Part, Denying in Part
20                                           All Defendants' Motions To Strike the
                                             Second Declaration of William E.
21   DEPARTMENT OF ENERGY; SAMUEL            Powers, (8) Denying Defendant-
     W. BODMAN, in his official capacity;    Intervenor Termoelectrica U.S.'s
22   KEVIN KOLEVAR, in his official capacity; Motion To Voir Dire William E.
     BUREAU OF LAND MANAGEMENT;              Powers, and (9) Denying as Moot All
23   REBECCA W. WATSON, in her official      Defendants' Motions To Strike the
     capacity,                               Declaration of Theodore D. Schade
24
                              Defendants,    [Doc. Nos. 225, 233, 238, 243, 247,
25                                           249, 253, 254, 255, 258]
           vs.
26
     TERMOELECTRICA U.S., LLC; BAJA
27   CALIFORNIA POWER, INC.,

28                     Defendant-Intervenors.

1   Presently before the Court are cross-motions for summary judgment filed by the Border

2   Power Plant Working Group ("plaintiff"); Department of Energy, Bureau of Land Management,

3   and agency officials ("federal defendants"); defendant-intervenor Termoelectrica U.S., LLC ("T-

4   US"); and defendant-intervenor Baja California Power, Inc. ("Baja").  Also presently before the

5   Court are the following evidentiary motions: defendants' motions to strike the first and second

6   declarations of William E. Powers, and the declaration of Theodore D. Schade; T-US's motion to

7   voir dire William E. Powers; and plaintiff's motion to strike the declaration of Octavio M.C.

8   Simoes.

9                                           **BACKGROUND[1]**

10  I.          Factual and Procedural History of the Prior Litigation

11  The Department of Energy ("DOE") is responsible for issuing Presidential permits for the

12  construction, operation, maintenance, and connection of electric transmission facilities at the

13  United States international border.  [D-1076, at 2; D-1077, at 2.[2]]  On February 27, 2001, Baja

14  applied to DOE for a Presidential permit to construct a 230-kV transmission line extending from

15  San Diego Gas & Electric Company's Imperial Valley Substation to the U.S.-Mexico border.  [D-

16  1077, at 2.]  There, the line would connect with transmission facilities in Mexico and extend to the

17  La Rosita Power Complex in Mexicali.  [Id.]

18  On March 7, 2001, Sempra Energy Resources ("SER") applied to DOE for a Presidential

19  permit to construct a 230-kV transmission line that would run parallel to the Baja line.  [D-1076, at

20  2.]  At the border, the line would connect with transmission facilities in Mexico and extend to the

21

22

23

24  _____

25  [1] The Administrative Record ("record") is a compilation of documents relied upon by the agencies in making their challenged decisions and sets forth the material facts in this case. On January 20, 2006, the federal defendants lodged the record as five CD-ROMs. The first four CD-ROMs contained the materials generated during the preparation of the environmental impact statement ("EIS") and the records of decisions ("RODs") challenged in the present litigation. The final CD-ROM contained the record materials that plaintiff challenged in the prior litigation.

26

27

28  [2] The Court cites to the Record by referring to the DOE or Bureau of Land Management ("BLM") document number and the page number of the Adobe portable document format (PDF) file.

1 Termoelectrica de Mexicali power plant.[3]  The primary purpose of both transmission lines is the

2 importation of power into the United States. [DOE-101, at 13.]

3      Because of the similarity in the proposals, DOE decided to consider both transmission lines

4 in a single environmental document.  [D-1077, at 3.]  DOE and BLM (collectively, "agencies")

5 concluded that an environmental assessment ("EA") was the appropriate level of review under the

6 National Environmental Policy Act ("NEPA").  [Id.]   On December 1, 2001, the agencies

7 completed the EA, and, based on that document, made a finding of no significant impact

8 ("FONSI").  [DOE-101, DOE-103.]  DOE issued the permits on December 5, 2001.  [DOE-104,

9 DOE-105.]  SER and Baja then began constructing the transmission lines, which commenced

10 operation to export electricity from Mexico in July 2003.  [Final Environmental Impact Statement

11 ("FEIS"), Vol. 1, at 1-1.]

12      On March 19, 2002, plaintiff filed its complaint against DOE, BLM, and agency officials

13 challenging the EA and FONSI.  [Doc. No. 1, at 2.]  Plaintiff alleged causes of action under NEPA

14 for DOE's failure to prepare an environmental impact statement ("EIS") or to analyze reasonable

15 alternatives.  [Id., at 16-19.]  The Court granted SER's and Baja's motions to intervene with

16 respect to the remedy phase.  [Doc. Nos. 18, 32.]  On January 30, 2003, the Court ordered the

17 substitution of T-US for SER.[4]  [Doc. No. 42.]

18      On May 2, 2003, applying the "arbitrary and capricious" standard of review under the

19 Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), this Court partially granted

20 plaintiff's motion for summary judgment as to the EA and FONSI's inadequate analysis on the

21 issues of the potential for controversy, water impacts, impacts of ammonia and carbon dioxide,

22

23      [3] Both proposed transmission lines would cross federal lands managed by BLM, a subdivision
of the Department of the Interior.  [D-1076, at 2 n.1.]  Therefore, Baja and Sempra each applied to
24 BLM for a right-of-way across the federal lands.  Although the Presidential Permits were issued by
DOE and the rights-of-way by BLM, both agencies relied upon the same environmental analysis
25 documents.  Additionally, for this litigation, the parties focused their briefing almost entirely on the
DOE's issuance of the Presidential permits.  [But see Pl. Reply, at 37 & n.26.]  For convenience, the
26 Court will follow suit and refer primarily to the DOE permits, although the Court's analysis applies
to both agencies' decisions.
27

28      [4] Pursuant to a reorganization of Sempra Energy, the corporate parent of both SER and T-US,
ownership, operation, and maintenance of the SER transmission line passed to T-US.  [Doc. No. 39,
at 3.]

1   reasonable alternatives, and cumulative impacts.  [Doc. No. 91, at 40.]   After denying plaintiff's

2   motion for injunctive relief [Doc. No. 124], the Court remanded to the agencies for preparation of

3   appropriate NEPA documents on July 9, 2003.  [Doc. No. 162, at 34.]  The Court prohibited the

4   agencies from considering on remand the completion of the transmission lines' construction, their

5   interim operation, or the Court's analysis of the environmental impacts.  [Id.]

6   II.       Factual and Procedural History of the Present Litigation

7           On October 24, 2003, DOE issued a Notice of Intent to prepare an EIS.  [D-0059, at 1.]

8   Pursuant to the Court's remand Order, the agencies "conduct[ed] their NEPA review from a fresh

9   slate, i.e., as if the transmission lines did not exist."  [Id., at 8.]  On May 11, 2004, DOE published

10  notice in the Federal Register that the Draft EIS was available.  [D-0702.]  DOE originally

11  provided a forty-five day period to comment on the Draft EIS, and extended the comment period

12  by one month at plaintiff's request.  [D-0717, at 1.]

13          On December 10, 2004, the agencies issued the FEIS and filed it with the Environmental

14  Protection Agency.  [Fed. Defs. Memo. ISO Motion, at 3; D-1069, at 1.]  The FEIS contained a

15  separate volume of comments received during the review period–including the transcripts of two

16  public hearings–along with DOE's responses to those comments.  [See FEIS Vol. 2.]  On April 18,

17  2005, DOE issued new permits to Baja and T-US.  [D-1076; D-1077.]

18          On April 25, 2005, DOE published the ROD in the Federal Register.  [D-1085.]  The ROD

19  explained what alternatives DOE had considered: (1) no action; (2) granting one or both permits

20  with corresponding right(s)-of-way, based on the current design of the Mexicali power plants

21  ("proposed action"); (3) granting one or both permits with corresponding right(s)-of-way, with

22  more stringent emissions controls and alternative cooling technologies installed at the Mexicali

23  power plants; and (4) granting one or both permits with corresponding right(s)-of-way, with off-

24  site mitigation measures implemented to minimize domestic environmental impacts.  [Id., at 3.]

25  On May 27, 2005, the federal defendants notified the Court that the agencies had completed the

26  FEIS and issued new RODs.  [Doc. No. 179.]

27          On August 18, 2005, pursuant to the parties' stipulation, the Court ordered the filing of

28  plaintiff's first amended complaint ("FAC").  [Doc. No. 181, at 4.]  The FAC alleges six (6) causes

of action: one under the Clean Air Act ("CAA"), four under NEPA, and one under the APA.

The first cause of action alleges that, based on data in the FEIS, the total number of direct and indirect emissions of pollutants in Imperial County caused by DOE's permitting actions exceeds regulatory thresholds. Therefore, plaintiff alleges the federal defendants violated the CAA by failing to conduct a conformity determination to ensure that the permits conform to California's state implementation plan for Imperial County.

In its opening brief, plaintiff voluntarily dismissed its second cause of action under NEPA for failure to evaluate cumulative impacts adequately.[5]  [Pl. Memo. ISO Motion, at 34 n.23.]

The third cause of action alleges a NEPA violation for failure to evaluate alternatives adequately. Plaintiff specifically alleges DOE failed to evaluate adequately certain alternative technologies, such as wet-dry cooling, that would minimize adverse environmental impacts and still satisfy the purpose and need for the project. Although DOE included a section on alternative technologies in the FEIS, the analysis was so "skewed" by inaccurate information that the alternatives were "never fairly presented to the public or the decisionmakers." [FAC ¶ 42.] Also, when preparing the FEIS, DOE assumed the power plants were already built and operating. Plaintiff alleges this assumption violated the Court-ordered prohibition against the federal defendants' consideration of the interim operation of the transmission lines or the completion of construction. [Id. ¶ 41 (quoting Doc. No. 162, at 33).]

The fourth cause of action alleges a violation of NEPA regulations for failure to ensure the scientific accuracy of relied-upon information. Specifically, in recommending against retrofitting the Mexicali power plants with wet-dry cooling technology, DOE failed to rely on high-quality data or accurate information about the appropriate design and cost of a wet-dry cooling system. DOE further failed to rely on accurate information in its analysis of the environmental impacts of a wet-dry cooling system, including the potential water savings and corresponding reductions in plant efficiency.

The fifth cause of action alleges a NEPA violation for inadequate analysis of mitigation

---

[5] Despite the voluntary dismissal, plaintiff's reply argues for NEPA violations predicated on the agencies' failure to consider cumulative impacts.  [See Pl. Reply ISO Motion, at, e.g., 27-28.]

1   measures.  While the ROD states the proposed action would be implemented without any

2   mitigation, plaintiff alleges the ROD's explanation of the decision not to mitigate is legally

3   insufficient.

4        The sixth cause of action alleges an APA violation for the defendants' "arbitrary and

5   capricious" agency action.  Plaintiff specifically alleges defendants' underlying violations of CAA

6   and NEPA are unlawful agency actions that the APA requires a reviewing court to set aside.

7        As remedies, plaintiff requests a declaratory judgment that (1) the permits were issued in

8   violation of the CAA, (2) the FEIS and ROD did not comply with NEPA, and (3) defendants

9   violated the APA.  Plaintiff also petitions the Court to (1) set aside the permits, (2) enjoin

10  operation of the transmission lines, or, (3) in the alternative, require mitigation measures to offset

11  air and water quality impacts–all pending completion of a CAA-compliant conformity

12  determination and a NEPA-compliant EIS and ROD.

13       On October 12, 2005, the Court granted T-US' and Baja's motions to intervene in all

14  phases of the case.  [Doc. No. 194.]

15       On October 18, 2005, the federal defendants answered the FAC.  [Doc. No. 195.]  On

16  November 1, 2005, T-US and Baja each answered the FAC.  [Doc. Nos. 197-98.]

17       On February 8, 2006, the Court denied defendant-intervenors' motion to dismiss plaintiff's

18  first cause of action.  [Doc. No. 214.]  The Court found defendant-intervenors did not "cite[] any

19  persuasive authority categorically exempting the emissions from the Mexican power plants from

20  analysis under the conformity provisions of the CAA because they occur outside Imperial

21  County."  [Id., at 6-7.]  In the absence of said authority, the Court then construed the definition of

22  "indirect emissions" to include the emissions from the Mexican power plants.  [Id. at 10-16.]

23       On March 29, 2006, the Court denied plaintiff's motion to bar all defendants from further

24  litigation on summary judgment of issues resolved in the Order denying the motion to dismiss.

25  [Doc. No. 224.]  The Court found the "law of the case" doctrine inapplicable because its findings

26  on the motion to dismiss were "not the type of concrete determinations that would ordinarily bar

27  further litigation of such issues[.]"  [Id., at 5.]

28       The Court adopted a briefing schedule for summary judgment motions on February 24,

2006.  [Doc. No. 218.]  On April 14, 2006, plaintiff filed its motion for summary judgment, accompanied by the declarations of William E. Powers and William R. Stockwell.  [Doc. Nos. 225, 227-28.]  On June 15, 2006, T-US filed its cross-motion for summary judgment, along with the declarations of Octavio M.C. Simoes and Alberto Abreu.  [Doc. Nos. 233, 236-37.]  That same day, Baja also filed its own cross-motion for summary judgment, accompanied by the declaration of Perry H. Fontana.  [Doc. Nos. 239-40.]  Finally, federal defendants filed their cross-motion for summary judgment <u>nunc</u> <u>pro</u> <u>tunc</u> to the same date.  [Doc. No. 243.]

On August 15, 2006, plaintiff filed its reply in opposition, accompanied by the declaration of Theodore D. Schade and the second declaration of William E. Powers.  [Doc Nos. 244-46.]  On September 15, 2006, T-US and Baja separately filed their replies.  [Doc. No. 259 (Baja); Doc. No. 261 (T-US).]  On September 18, 2006, federal defendants filed their reply.  [Doc. No. 257.]

On October 6, 2006, the Court held oral argument on the motions for summary judgment and the motions to strike,[6] and took these motions under submission.

## MOTIONS TO STRIKE

Before the Court addresses the parties' legal claims, it must determine what evidence beyond the record is admissible in deciding those claims.  Therefore, the Court begins by addressing the parties' motions to strike.

I.      Expert Testimony of William E. Powers

William E. Powers is a professional mechanical engineer and the chairperson of plaintiff's organization.  [First Powers Decla. ¶ 1.]  In its motion to strike both Powers declarations, T-US

---

[6] While complying with the summary judgment briefing schedule, the parties also filed motions to strike certain of the declarations accompanying the motion papers.  A concise list of those motions appears in the caption and first paragraph of this Order.

At oral argument, the Court granted the following motions: plaintiff's motion to withdraw its motion to file surreply [Doc. Nos. 268-69], plaintiff's motion for leave to file documents referred to in the declaration of Theodore D. Schade [Doc. No. 269], plaintiff's motion for leave to file documents  referred to in the second declaration of William E. Powers [Doc. No. 275], federal defendants' motion to file motion for summary judgment <u>nunc</u> <u>pro</u> <u>tunc</u> [Doc. No. 270], and T-US's motion for joinder in federal defendants' motion to strike the first and second declarations of William E. Powers [Doc. No. 256.]

The Court now grants Baja's motion to join the motions to strike filed by the federal defendants and T-US.  [Doc. No. 258.]

1   argues that Powers is not an expert.  T-US explains that Powers does not have a graduate degree in

2   engineering and has experience only in the emissions testing aspects of power plant operations, but

3   not cooling technologies.[7]  T-US further alleges that Powers's conclusions are inaccurate because

4   Powers never visited the actual power plants to which the transmission lines are connected.

5   Where "specialized knowledge will assist" the Court in understanding evidence, a qualified

6   expert witness may offer opinion testimony, "if (1) the testimony is based upon sufficient facts or

7   data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has

8   applied the principles and methods reliably to the facts of the case."  Fed. R. Evid. 702.  The

9   district court enjoys great discretion in determining whether the expert's testimony is reliable.[8]

10  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999).  Applying that discretion to this case,

11  the Court finds Powers is qualified to testify as an expert.  Powers co-authored a presentation on

12  dry-cooling systems at an EPA symposium with Ralph Wyndrum.[9]  [Second Powers Decla. ¶ 1 &

13  n.1.]  He has made presentations on cooling technologies at conferences sponsored by the

14  California Energy Commission.  [Id.; see Daubert v. Merrill Dow Pharm., Inc., 509 U.S. 579, 593-

15  94 (stating that peer review and "submission to the scrutiny of the scientific community" are

16  "pertinent consideration[s]" in determining the validity of an expert's opinion).]  He has served as

17  an expert witness on power plant cooling in administrative law cases.[10]  Taken together, Powers's

18

---

19  [7] To support its argument about Powers's experience, T-US submits Powers's resume and
20  correspondence with Octavio Simoes.  All materials date back to the 1990s, when Powers tried to
    solicit work from Simoes on an emissions permitting project.

21  [8] The same level of discretion extends to the manner in which the district court determines the
22  reliability of the expert's testimony.  Kumho Tire, 526 U.S. at 152.  Applying this discretion, the Court
    is satisfied that Powers meets the requirements of an expert, based on the statements in his declaration
23  and the arguments in the briefs on this issue.  The Court denies T-US's request to voir dire Powers.

24  [9] When commenting on the draft EIS, Simoes, in fact, relied on data provided by Wyndrum.
    [Simoes Decla. ¶ 19.]

25  [10] In fact, after the oral argument, T-US filed an ex parte application asking the Court to take
26  judicial notice of an administrative law decision in which the ALJ rejected Powers's ultimate
    conclusions.  [Doc. No. 279.]  The Court takes judicial notice as to Powers's participation in the
27  decision and the fact of the ALJ's decision.  However, the ALJ's decision is not helpful to the
    resolution of this question beyond the fact that the ALJ recognized Powers as an expert.  [Doc. No.
28  279, Exhibit 1, at 31.]  Furthermore, in the process of filing this ex parte application, T-US brought
    the Court's attention to yet another administrative law case in which the ALJ is actually considering
    the cooling system proposed by Powers.  [See id., at 2 n.2; Doc. No. 280, at 3 n.2.]

02cv513

1   experience satisfies the Court that he meets the qualifications of an expert.  T-US's remaining

2   objections are focused on Powers's conclusions, and this Court cannot consider the expert's

3   conclusions in the threshold determination of reliability.[11]  See Daubert, 509 U.S. at 595 ("The

4   focus, of course, must be solely on principles and methodology, not on the conclusions that they

5   generate.").

6   II.     Extra-Record Evidence

7          A.     Legal Standard

8          In reviewing a claim under the APA, "the focal point for judicial review should be the

9   administrative record already in existence, not some new record made initially in the reviewing

10  court."  Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743 (1985) (quoting Camp v. Pitts, 411

11  U.S. 138, 142 (1973)).  A court may not consider evidence outside the record to determine whether

12  the agency made the correct decision.  Asarco, Inc. v. U.S. Envtl. Prot. Agency, 616 F.2d 1153,

13  1160 (9th Cir. 1980);  Ctr. for Biological Diversity v. Fed. Highway Admin., 290 F. Supp. 2d

14  1175, 1200-01 (S.D. Cal. 2003).  However, the district court may go beyond the record when such

15  evidence helps to explain the agency's action.  Animal Def. Council v. Hodel, 840 F.2d 1432,

16  1436 (9th Cir. 1988), amended by 867 F.2d 1244 (9th Cir. 1989).  Specifically, extra-record

17  evidence is admissible if any of these "narrow exceptions" applies: "(1) if admission is necessary

18  to determine whether the agency has considered all relevant factors and has explained its decision,

19  (2) if the agency has relied on documents not in the record, (3) when supplementing the record is

20  necessary to explain technical terms or complex subject matter, or (4) when plaintiffs make a

21  showing of agency bad faith."  Nw. Envtl. Advocates v. Nat'l Marine Fisheries Serv., 460 F.3d

22  1125, 1145 (9th Cir. 2006) (quoting Lands Council v. Powell, 395 F.3d 1019, 1030 (9th Cir.

23  2005)) (other internal quotations omitted).  The first and third exceptions are potentially applicable

24  to these facts.

25  //

26

27          [11] The Court recognizes it has the discretion to exclude the expert's testimony where "there
    is simply too great an analytical gap between the data and the opinion proffered."  Gen. Elec. Co. v.
28  Joiner, 522 U.S. 136, 146 (1997).  However, given the highly technical subjects of Powers's testimony
    and the value of any scientific perspective that can shed light on these subjects, the Court is unable
    to conclude Mr. Powers is not an expert merely because of his conclusions.

- 9 -                                                        02cv513

B.      First Declaration of William E. Powers

Plaintiff acknowledges the frequency of Powers's participation during the comment period, identifying at least six documents Powers submitted for the record.  [Pl. Opp. to Fed. Defs. Motion To Strike First Powers Decla., at 7-8.]  Furthermore, plaintiff repeatedly argues that the information in the First Powers Declaration was contained in the record.  [Id., at 1, 7-8.]  A court may strike extra-record evidence consisting of information that "already exists in the record" or "[is] extracted from the record."  Sw. Ctr. for Biological Diversity v. U.S. Forest Serv., 100 F.3d 1443, 1451 (9th Cir. 1996). The federal defendants argue the First Powers Declaration falls into a Catch-22: either the contents of the declaration are already in the record, or they provide "new, belated criticism" of the agencies' substantive conclusions, and are inadmissible in either case. [Fed. Defs. Reply ISO Motion To Strike First Powers Decla., at 6-7.]

However, under the federal defendants' argument, any challenge to an agency's decision-making process could be construed as an impermissible challenge to its substantive conclusions. Such a construction would leave no room for the established exception allowing courts to consider extra-record evidence where necessary to determine if the agency has considered all relevant factors and explained its decision.  The Ninth Circuit recently invoked this exception when it admitted a declaration discussing measurement errors in an FEIS's analysis of tree mortality rates. Earth Island Inst. v. U.S. Forest Serv., 442 F.3d 1147, 1162-63 (9th Cir. 2006).  The declaration established the FEIS was "misleading" because the FEIS did not accurately report the findings of the studies it purportedly relied upon.  Id. at 1166-67; cf. Hodel, 840 F.2d at 1437 (where information appears in the administrative record, evidence would still be admissible unless explicitly discussed in the EIS); Friends of the Payette v. Horseshoe Bend Hydroelectric Co., 988 F.2d 989, 997 (9th Cir. 1993) (extra-record evidence admissible "[w]hen a failure to explain action frustrates judicial review").

Because of the similar allegations in this case, the Court finds it appropriate to admit portions of the First Powers declaration.  For example, the declaration discusses potentially relevant factors–including the existence of power plants of similar sizes in similar climates with dry-cooling systems–that the agency allegedly failed to consider.  The declaration also discusses

02cv513

1    problems in the agency's reasoning–including purportedly incorrect assumptions about the design
2    of the dry-cooling system the power plants could feasibly accommodate–that could potentially call
3    into doubt whether the agency adequately explained its decision.

4         Furthermore, the subject matter of this case is highly complex and technical.  The NEPA
5    causes of action center largely on the engineering design of the cooling system at the power plants.
6    When the federal defendants argue that "the vast majority of the Powers Declaration" improperly
7    goes to Powers's substantive disagreement with the FEIS, they impliedly concede that some
8    portion of the First Powers Declaration would help the Court understand the technical issues in
9    this case. In the first declaration, Powers explains the operation of various types of power plants
10   and their water demands.

11        Nonetheless, certain paragraphs of the First Powers Declaration clearly do not fall within
12   any of the established exceptions to the rule against extra-record evidence.  Therefore, the Court
13   strikes these paragraphs of the First Powers Declaration for the reasons stated:

14        Paragraph 12 states that T-US's corporate parent, Sempra Energy, asked its cooling vendor
15   to submit a proposed wet-dry cooling system to DOE based on unrealistic assumptions.
16   Criticizing the quality of data submitted by another commenter is not a proper reason to admit
17   extra-record evidence.

18        Paragraph 14 describes the agreement of the parties on the unit cost of a dry cooling
19   system. Plaintiff does not allege that the agencies failed to consider this factor, nor is this a highly
20   technical computation. For similar reasons, the Court strikes paragraph 15, which discusses the
21   potential costs to ratepayers of a wet-dry cooling system, and paragraph 18, which discusses the
22   parties' agreement on the cost of a new surface condenser.

23        Paragraph 22 improperly objects to DOE's decision on the merits.  It does not object to
24   DOE's decision-making process; any comments directed to the process are duplicative of
25   comments in other paragraphs the Court finds admissible.

26        Paragraphs 24-27 discuss the feasibility of conducting a CAA conformity determination.
27   Whether the agencies must conduct a conformity determination is a question of law not
28   implicating complex or technical facts.  Because the CAA conformity determination is legally

1    separate from the NEPA analysis, the evidentiary exception for the agency's consideration of

2    relevant factors and explanation of its decision does not apply.

3        *C.*    *Declaration of Octavio M.C. Simoes*

4        Octavio M.C. Simoes is a registered professional engineer and the Vice President of Asset

5    Management for Sempra Generation.  [Simoes Decla. ¶¶ 2, 4.]  He oversaw development and

6    construction of the Mexicali power plant to which the T-US transmission line connects.  [Id. ¶ 4.]

7    T-US submitted Simoes' declaration because, "[t]o the extent the Court considers the Powers'

8    declaration, it should likewise consider the Simoes Declaration."  [T-US Opp. to Pl.'s Mot. &

9    Memo. ISO Cross-Mot., at 4 n.4.]

10       Plaintiff moves to strike the Simoes Declaration because it purportedly amounts to an

11   "impermissible post hoc rationalization of an agency decision, made in response to litigation."  See

12   Kunaknana v. Clark, 742 F.2d 1145, 1149 (9th Cir. 1984) (holding that such rationalizations are

13   generally inadmissible, and, even when admissible, must not articulate a new rationalization).

14   Plaintiff views the Simoes declaration as a backdoor attempt to patch up gaps in the FEIS's

15   reasoning exposed by this litigation and the First Powers Declaration.

16       The Court finds, instead, that portions of the Simoes Declaration fall within the well-

17   established exception allowing supplementation of the record "to permit explanation or

18   clarification of technical terms or subject matter involved in the agency action under review."[12]

19   Pub. Power Council v. Johnson, 674 F.2d 791, 794 (9th Cir. 1982).  Among the documents

20   available to the Court, the Simoes Declaration provides the clearest explanation of such technical

21   terms as "duct firing," "efficiency penalty," and "parallel cooling system."

22       What plaintiff characterizes as "post hoc rationalization" is, in most cases, a response to the

23   information introduced in the First Powers Declaration.  The Simoes Declaration explains, for

24   example, that the Sempra Generation plant is actually distinguishable from the purportedly similar

25   power plants discussed in the First Powers Declaration.  In other words, whereas the First Powers

26   _____

27   [12] The concept of the Simoes Declaration as a "post hoc rationalization" is initially dubious because T-US is the party submitting the declaration.  If the agencies were trying to prop up the FEIS's analysis with the Simoes Declaration, one would have expected the federal defendants to

28   submit the declaration, or, at least, file a brief in opposition to plaintiff's motion to strike the declaration.

Declaration suggested that other power plants are "relevant factors" the agencies should have considered, the Simoes Declaration establishes that those plants are irrelevant to the agencies' decision regarding the Sempra Generation plant because the Sempra Generation plant is different. See Earth Island Institute, 442 F.3d at 1163-64 (where Ninth Circuit allowed plaintiff to introduce an extra-record declaration to show that agency did not consider all relevant factors, agency was allowed to introduce responsive declaration in rebuttal). And, the difference between power plants is itself the kind of complex subject matter for which courts consider supplemental evidence.

Nonetheless, certain paragraphs of the Simoes Declaration clearly do not fall within any of the established exceptions to the rule against extra-record evidence. Therefore, the Court strikes these paragraphs of the Simoes Declaration for the reasons stated:

Paragraph 7 is irrelevant. It attacks Mr. Powers's credentials and praises the high quality of analysis in a document Simoes submitted for the record.

Paragraph 8, in its last sentence, cites paragraphs of the First Powers Declaration that the Court has already stricken.[13]

Paragraph 17 does not address the agency's failure to consider relevant factors, nor does it explain technical subject matter. It merely elaborates on documents submitted for the record.

Paragraphs 21-23 merely summarize a document Simoes submitted for the record. [See D-809, Exhibit B.] The Court may not rely on extra-record evidence when it can review the very same evidence submitted for the record.

*D.* *Second Declaration of William E. Powers*

With its reply, plaintiff submits the Second Powers Declaration. Plaintiff argues for the admission of this declaration under the same exceptions as before: determining whether the agency considered all relevant factors, explaining the agency's decision, and understanding technical subject matter. Defendants argue that the Second Powers Declaration does not actually fall within the recognized exceptions and is cumulative of other comments that Powers submitted–both for the record and in his first declaration.

---

[13] Again, T-US offers the Simoes Declaration only to the extent the Court considers the First Powers Declaration. The Court is not considering the paragraphs of the First Powers Declaration cited in the last sentence of Simoes Declaration ¶ 8.

02cv513

1    Although the Court applies the same law as it did with the First Powers Declaration, the

2    Court views the Second Powers Declaration more skeptically. The Ninth Circuit has

3    acknowledged the risk district courts face if they admit too much testimony under the exception

4    for technical subject matter: eventually, the technical testimony will cease explaining the subject

5    matter and start reaching impermissibly to the merits of the agency's decision.  Asarco, 616 F.2d at

6    1160-61.  In Asarco, the Ninth Circuit held that the district court abused its discretion because "the

7    scientific inquiry undertaken at trial necessarily led the district court to substitute its judgment for

8    that of the agency."  Id. at 1161.

9    Applied to these facts, the Court perceives the Second Powers Declaration to spend less

10   time drawing the Court's attention to potentially relevant factors not considered by the FEIS or

11   explaining technical subject matter.  Instead, the Second Powers Declaration spends more time

12   opposing the Simoes Declaration, interpreting Powers's own submissions to the record, and

13   redirecting the Court's attention to the First Powers Declaration.  Plaintiff's NEPA causes of

14   action are directed against the FEIS, not the Simoes Declaration.  Furthermore, the Court need not

15   admit Powers's comments on his submissions for the record or his own first declaration; the Court

16   can read those documents for itself.  Therefore, the Court strikes the following paragraphs of the

17   Second Powers Declaration for the reasons stated:

18   Paragraphs 2-4 reiterate and summarize comments Powers submitted for the record.

19   Paragraph 5 repeatedly cites the Simoes Declaration and the First Powers Declaration, but

20   makes no reference to the FEIS.

21   Paragraphs 6-8 do not identify relevant considerations the agency failed to consider or

22   explain technical subject matter.  Instead, they attempt to cast doubt on the arithmetic in Simoes's

23   submission for the record and speculate about his calculations.

24   Paragraphs 9-10, though briefly alluding to the FEIS, are devoted to disputing the

25   conclusions of the Simoes Declaration.

26   All sentences of paragraph 12 that cite to the Simoes Declaration or First Powers

27   Declaration are irrelevant to the adequacy of the FEIS.

28   Paragraph 13 exclusively criticizes the Simoes Declaration.

1    Paragraph 16 discusses the CAA conformity determination.   Whether the agencies must

2    conduct a conformity determination is a question of law not implicating complex or technical

3    facts.  Because the CAA conformity determination is legally separate from the NEPA analysis, the

4    evidentiary exception for the agency's consideration of relevant factors and explanation of its

5    decision does not apply.

6        E.    *Declaration of Theodore D. Schade*

7    Theodore D. Schade is a professional engineer and an air pollution control officer with the

8    Great Basin Air Pollution Control District.  [Schade Decla. ¶ 1.]  Plaintiff submits the Schade

9    Declaration in support of its CAA claim.  The gravamen of the Schade Declaration is that the FEIS

10   improperly computed the emissions of a particular pollutant that would result from wind erosion at

11   the Salton Sea if the power plants continue to operate.  [Id. ¶ 9.]

12   All defendants' motions to strike the Schade Declaration are denied as moot.  In deciding

13   the CAA claim, the Court relies on statutes, regulations, and portions of the FEIS not implicated

14   by the Schade Declaration.  Because the Court need not consider the Schade Declaration in its

15   disposition of the CAA claim, it will not consider whether the Schade Declaration falls within one

16   of the established exceptions for admitting extra-record evidence.

17   **LEGAL STANDARD FOR SUMMARY JUDGMENT**

18   I.    Legal Standard

19   "Under Rule 56(c), summary judgment is proper when the pleadings and discovery, read in

20   the light most favorable to the nonmoving party, demonstrate that there is no genuine issue as to

21   any material fact and that the moving party is entitled to judgment as a matter of law."  Armstrong

22   v. Burlington N. R.R. Co., 139 F.3d 1277, 1278 (9th Cir. 1998) (quoting 20th Century Ins. Co. v.

23   Liberty Mut. Ins. Co., 965 F.2d 747, 750 (9th Cir. 1992)); see also Anderson v. Liberty Lobby,

24   Inc., 477 U.S. 242, 248 (1986).  A dispute is "genuine" when "the evidence presented is such that

25   a jury applying [the appropriate] evidentiary standard could reasonably find for either the plaintiff

26   or the defendant."  Anderson, 477 U.S. at 255.

27   Neither NEPA nor the CAA independently provides for judicial review.  Sierra Club v.

28   U.S. Envt'l Prot. Agency, 346 F.3d 955, 961 (9th Cir. 2003) (CAA); Hells Canyon Alliance v.

1    U.S. Forest Serv., 227 F.3d 1170, 1176 (9th Cir. 2000) (NEPA).  Instead, a court reviews agency

2    action under the provisions of the APA.  Id.  The APA requires a reviewing court to "hold

3    unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary,

4    capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. §

5    706(2)(A).  Under this "highly deferential" standard of review, "the court 'must consider whether

6    the decision was based on a consideration of the relevant factors and whether there has been a

7    clear error of judgment.'"  Friends of the Earth v. Hintz, 800 F.2d 822, 831 (9th Cir. 1986)

8    (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971)).  The court

9    must not find the agency action to be arbitrary or capricious "unless there is no rational basis for

10   the action."  Id.

11          When reviewing final agency action, "resolution of th[e] matter does not require fact

12   finding on behalf of this court.  Rather, the court's review is limited to the administrative

13   record[.]"  Nw. Motorcycle Ass'n v. U.S. Dep't of Agric., 18 F.3d 1468, 1472 (9th Cir. 1994).  In

14   the absence of fact finding, summary judgment is an "appropriate" vehicle for disposing of the

15   legal issues.  Id.

16                                          **CAA CLAIM**

17   I.     Legal Standard

18          A.     *Conformity Determinations*

19          The CAA directs that EPA "shall by regulation promulgate . . . proposed national

20   . . . ambient air quality standards [NAAQS]."  42 U.S.C. § 7409(a)(1)(B); cf. 42 U.S.C. §

21   7409(a)(2) (similar).  Pursuant to their primary responsibility for maintaining air quality, states

22   must submit a state implementation plan (SIP) "which will specify the manner in which [NAAQS]

23   will be achieved and maintained . . . in such state."  Id. § 7407(a); cf. § 7410(a)(1) (SIP must

24   "provide[] for implementation, maintenance, and enforcement" of each NAAQS).   Once a state

25   submits a list of its areas in nonattainment, EPA then promulgates the official designation of the

26   area as "nonattainment" for one or more particular pollutants.  Id. § 7407(d)(1)(B).

27          EPA has designated Imperial County as a severe nonattainment area for particulate matter

28   under ten microns in diameter ("PM10 emissions").  EPA has further designated Imperial County

as a nonattainment area for ozone.  Because ozone is not produced directly, EPA focuses on emissions of its precursors: nitrogen oxides ("NOX emissions") and volatile organic compounds ("VOC emissions").  41 C.F.R. § 51.852.

The CAA further mandates, "No department, agency, or instrumentality of the Federal Government shall . . . license or permit . . . any activity which does not conform to an implementation plan."  42 U.S.C. § 7506(c)(1).  The CAA instructs EPA to "promulgate . . . criteria and procedures for determining conformity[.]"  Id. § 7506(c)(4)(A).  Therefore, EPA has promulgated a regulation stating, "For Federal actions . . . a conformity determination is required for each criteria pollutant or precursor where the total of direct and indirect emissions of the criteria pollutant or precursor in a nonattainment . . . area caused by a Federal action would equal or exceed" the stated emission rates.[14]  40 C.F.R. § 51.853(b).  The conformity determination must rely "on the most recent estimates of emissions."  42 U.S.C. § 7506(c)(1).  EPA requires "the latest and most accurate emission estimation techniques available . . . (2) such as actual stack test data from stationary sources which are part of the conformity analysis."  40 C.F.R. § 51.859(b)(2).

EPA has defined indirect emissions as:

those emissions of a criteria pollutant or its precursors that:

(1) Are caused by the Federal action, but may occur later in time and/or may be farther removed in distance from the action itself but are still reasonably foreseeable; and

(2) The Federal agency can practicably control and will maintain control over due to a continuing program responsibility of the Federal agency.

Id. § 51.852. Emissions are "caused by" a federal action when they "would not otherwise occur in the absence of the Federal action."  Id.  An agency has "continuing program responsibility" for emissions when they

are specifically caused by an agency carrying out its authorities, and [not] emissions that occur due to subsequent activities, unless such activities are required by the Federal agency.  Where an agency, in performing its normal program responsibilities, takes actions itself or imposes conditions that result in air pollutant emissions by a non-Federal entity taking subsequent actions, such emissions are covered by the meaning of a continuing program responsibility.

---

[14] For PM10 emissions, the total of direct and indirect emissions caused by the federal action must not exceed 70 tons per year (tpy).  40 C.F.R. § 51.853(b)(1). For NOX and VOC emissions, the limit is 100 tpy.  Id. § 51.853(b).

Id.

The issue is whether the federal defendants must conduct a conformity determination for the permitting of the two power plants in this case.

### B.    EPA Guidance Document

After EPA promulgated the general conformity rules, it published a question-and-answers document to "deal[] with questions frequently asked of EPA regarding conformity."  Office of Air Quality Planning and Standards, General Conformity Guidance: Questions and Answers (1994), http://www.epa.gov/air/genconform/documents/gcgqa_940713.pdf, at ii.  The guidance document "represents EPA's interpretation of the general conformity rule."  Id.

When this Court issued its Order on defendant-intervenors' motion to dismiss, question 20 of the guidance document contained the following language:

> **20.** Does the rule apply to activity that occurs in attainment areas that could impact nonattainment areas?
>
> A: If an activity in an attainment area causes indirect emission increases within a nonattainment area, they may have to be analyzed.  The current nonattainment rule does not indicate how this situation should be dealt with.  Until EPA issues guidance on this, or addresses this instance in an attainment area rule on conformity, Federal agencies should make their own decisions as to how the rule applies to attainment areas with respect to this scenario.

Id. at 10.  Quoting the first sentence of the answer to this question 20, the Court found that the "Guidance Document does not give clear guidance as to whether emissions occurring outside the United States need to be included in a conformity analysis."  [Doc. No. 214, at 8.]

On June 5, 2006, EPA revised its guidance document. William T. Hartnett, Memorandum, Revision to General Conformity Applicability Questions and Answers, http://www.epa.gov/air/genconform/documents/Jun06/Revision_to_General%20_Conformity_Applicability_Q&As.pdf, at 1.  The memorandum acknowledged CAA amendments, enacted in 1995 after the issuance of the guidance document, which required conformity only in nonattainment and maintenance areas.[15]  In response to the statutory amendments, EPA revised question 20 to read as follows:

_____

[15] The memorandum explains that the ambiguity of the old question 20 reflected EPA's uncertainty whether the statute required conformity determinations within attainment areas. The 1995 statutory amendments clarified that conformity was not required within attainment areas, thus enabling EPA to issue a document that more clearly stated when conformity was required.

02cv513

**20(a).**  Does the rule apply to a Federal activity that occurs outside a nonattainment or maintenance area but may impact nonattainment areas through transport of direct or indirect emissions?

A:  No.  Consistent with the statutory [amendments] as enacted in 1995, general conformity applies only to federal actions undertaken in a nonattainment or maintenance area.  Further, federal agencies are not required to undertake a general conformity analysis for a federal action which is undertaken in an attainment or unclassified area and which may cause emissions, whether direct or indirect, in an attainment or unclassified area which may be transported into a nonattainment or maintenance area.

**20(b).**  Does the rule apply to a Federal action that occurs inside a nonattainment or maintenance area and has direct or indirect emissions both in and outside nonattainment areas?

A:  In this case, only the emissions originating within the boundaries of the nonattainment or maintenance area where the action is taking place need to be analyzed under the general conformity requirements.  In other words, *emissions originating outside the nonattainment or maintenance area do not need to be considered in the applicability analysis or conformity analysis*, consistent with EPA's interpretation of [the 1995 statutory amendments].

Id. at 2 (emphasis added).

II.    Analysis

A.    *Number of Federal Action(s)*

A threshold question under the CAA claim is whether the Court should treat each permit as a separate federal action, or consider both permits together as a single federal action.  Plaintiff asserts that DOE has treated the permitting of the transmission lines as a single action with two components (i.e., two permits).  Plaintiff points to the preparation of a single EA and EIS, the issuance of a single ROD, and instances within those documents (including the definition of the proposed action and analysis of environmental impacts) where the agencies treated the issuance of two permits as one action.

NEPA regulations promulgated by the Council of Environmental Quality urge agencies to analyze separate federal actions in the same EIS where appropriate: if "[s]imilar actions . . . provide a basis for evaluating their environmental consequences together, such as common timing or geography[,]" then the agency "may wish to analyze these actions in the same impact statement."  40 C.F.R. § 1508.25(a)(3).  Applying this standard, the permits in this case are particularly appropriate for evaluation in the same EIS because the corporate parents of T-US and Baja applied for the permits within about a month of one another, and the transmission lines run

1    parallel over the same federal lands.  The agencies properly followed the recommendations of the

2    CEQ regulations.

3         Furthermore, although the FEIS does occasionally treat the permits jointly, the relevant

4    documents makes clear that two different federal actions are at issue.  The ROD clearly states,

5    "[d]ue to the similarities of these proposals, DOE and BLM decided to cooperate on the

6    environmental review and to consider both proposals in a single environmental document."  [D-

7    1085, at 2.]  The FEIS described the proposed action as "grant[ing] one or both permits and

8    corresponding [rights-of-way]."  [FEIS, Vol. 1, at S-17.]  In considering the emissions of criteria

9    air pollutants from the power plants–a dispositive issue in the plaintiff's CAA conformity

10   claim–the FEIS separates the T-US plant from the Baja plant when reporting the results.  [FEIS,

11   Vol. 1, at 4-43.]  These examples, along with similar references throughout the FEIS, convince the

12   Court that the agencies avoided de facto conflation of the two permits into a single federal action.

13        Finally, treating the permits as separate federal actions is consistent with this Court's

14   findings in the first round of summary judgment motions.  There, the Court treated the permits

15   separately to determine the environmental impacts of each power plant.  [Doc. 91, at 17.]

16        Merely because each permit is a separate federal action, the Court is able to grant summary

17   judgment to Baja.  Emissions data provided by plaintiff in its reply brief show that, if the Baja

18   power plant is treated separately from the T-US facility, its total emissions do not exceed

19   conformity determination thresholds.  [Pl. Reply ISO Motion, at 22.]

20        B.    Applicability of Guidance Document

21        Where agencies provide guidelines or comments regarding the implementation of their own

22   regulations, that guidance receives "controlling weight" unless it (1) violates the Constitution, (2)

23   impermissibly construes the governing statute, or (3) "is plainly erroneous or inconsistent with the

24   regulation."  Stinson v. United States, 508 U.S. 36, 45 (1993) (internal quotations omitted); see

25   League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Forsgren, 309 F.3d 1181,

26   1183 (9th Cir. 2002) (same).  By contrast, where an agency interprets the statute in a context other

27   than formal adjudication or notice-and-comment rulemaking, the agency's interpretation is

28   "'entitled to respect' . . . but only to the extent that th[e] interpretation[] ha[s] the 'power to

1   persuade[.]'" Christensen v. Harris County, 529 U.S. 576, 587 (2000) (quoting Skidmore v. Swift

2   & Co., 323 U.S. 134, 140 (1944)) (internal citations omitted); see Vigil v. Leavitt, 381 F.3d 826,

3   835 (9th Cir. 2004) (same, in the context of EPA's publication in the Federal Register of

4   preliminary views on certain CAA provisions).

5        Applied to these facts, the Court finds that the guidance document interprets the

6   regulations, rather than the statute.  The language of the guidance document itself strongly

7   supports this finding, for the introduction to the document states that it "represents EPA's

8   interpretation of the general conformity rule." General Conformity Guidance, at 2.  Although both

9   the memorandum introducing the June 2006 revision and the revised question 20 itself reference

10  the 1995 statutory amendments, those references do not transform the guidance document into an

11  interpretation of the statute.  Instead, those references are merely intended to confirm that EPA's

12  interpretation of its regulations is consistent with the CAA.  The fact that an agency takes pains to

13  interpret its regulations consistently with the statute does not mean the agency is interpreting the

14  statute.[16]

15       The revised guidance document permissibly construes the governing statute–indeed, EPA

16  revised the guidance document to interpret its regulations consistently with statutory amendments.

17  The broad language of the amendments states that the CAA's conformity provisions "shall apply

18  only with respect to– (A) a nonattainment area." 42 U.S.C. § 7506(c)(5)(A).  This language can be

19  interpreted not just to require a conformity determination only in nonattainment areas, but also to

20  limit the conformity determination itself to emissions taking place within the nonattainment area.

21  Although plaintiff argues that the statute's joint definition of "emission limitation" and "emission

22

23

24

25       [16] The CAA itself provides remarkably little detail on conformity.  The statute prohibits
     nonconformity with a state implementation plan and defines conformity.  42 U.S.C. § 7605(c)(1).  As
26   amended in 1995, the statute limits when the agency must conduct a conformity determination.  Id.
     § 7506(c)(5).  The statute then leaves to EPA the responsibility to figure out "criteria and procedures
27   for determining conformity[.]"  Id. § 7506(c)(4)(A).  Determining what emissions will count in a
     conformity determination clearly falls within the "criteria and procedures" that EPA promulgates
28   through regulations.  Therefore, when considered from another angle, EPA's guidance document still
     interprets the regulations.

02cv513

1  standard"[17] does not necessarily exclude emissions from outside the nonattainment area, the

2  definition, at most, creates ambiguity on the question of what emissions an agency must take into

3  account in a conformity determination.  Because of the statutory ambiguity, and because of EPA's

4  statutory mandate to promulgate regulations concerning the "criteria and procedures" for

5  conformity determinations, 42 U.S.C. § 7506(c)(4)(A), the guidance document permissibly

6  construes the CAA.

7      The agency's interpretation is not plainly erroneous or inconsistent with the text of the

8  regulations merely because the definition of indirect emissions includes emissions "farther

9  removed in distance from the action itself."  40 C.F.R. § 51.852.  Limiting the conformity

10 determination to emissions within the nonattainment area does not render this definition

11 superfluous.  The language leaves open the possibility of emissions reasonably foreseeable from

12 the federal action that occur elsewhere within the nonattainment area.   Indirect emissions can be

13 "removed in distance" from a federal action while still taking place within a nonattainment area.

14 This possibility is sufficient to make the guidance document's interpretation "not plainly erroneous

15 or inconsistent" with the regulations themselves.  See Stinson, 508 U.S. at 45.

16     Even if the guidance document interpreted the statute, the Court would find it persuasive in

17 this particular context of emissions from power plants in Mexico crossing the international border

18 into Imperial County.  As counsel for the federal defendants explained at oral argument, the power

19 plants "[a]re being regulated by a different governmental agency, in this sense a different country,

20 that has primary responsibility for the emissions of those power plants."  [Transcript of Motions

21 Hearing ("Trans."), at 40:18-21.]  When the Mexican government, and not DOE, issued permits

22 for the power plants in Mexicali, the foreign government, "as the United States government does

23 for facilities in the United States, [made] a bunch of trade-offs into . . . the level it wants to impose

24 for environmental protections vs. the need for its economy and generating electricity and jobs[.]"

25 [Id., at 39:16-20.]  Elsewhere, the CAA defers to foreign governments' trade-offs on air quality:

_____

27      [17] "The terms 'emission limitation' and 'emission standard' mean a requirement established by the State or the Administrator which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis, including any requirement relating to the operation or maintenance

28 of a source to assure continuous emission reduction, and any design, equipment, work practice or operational standard promulgated under this chapter[.]"  42 U.S.C. § 7602(k).

1  the EPA Administrator will approve a SIP if the state can show that the SIP "would be adequate to

2  attain and maintain the relevant [NAAQS] . . . , but for emissions emanating from outside of the

3  United States." 42 U.S.C. § 7509a(a)(2).  Therefore, the guidance document's interpretation is

4  certainly persuasive in excluding emissions outside the country altogether, from sources that are

5  permitted and regulated by a foreign government.[18]

6        Therefore, on the basis of the revised guidance document, the Court finds that DOE did not

7  have to consider emissions from outside Imperial County in its conformity determination.

8  Specifically, DOE did not have to consider emissions from the power plants in Mexicali.  Without

9  considering emissions from the power plants, and by treating each permit as a separate federal

10  action, plaintiff cannot show that emissions exceed the conformity determination thresholds at the

11  T-US power plant.  [See Pl. Reply ISO Motion, at 22; Trans., at 6:1-3.]  Plaintiff's CAA claim

12  fails as a matter of law.

13                              **NEPA CLAIMS**

14  I.      NEPA Generally

15        "NEPA does not guarantee substantive results."  Nat'l Parks & Conservation Ass'n v. U.S.

16  Dep't of Transp., 222 F.3d 677, 682 (9th Cir. 2000).  Instead, as a "procedural statute," NEPA

17  _____

18        [18] The federal defendants offered these and other arguments to support the proposition that
emissions from the Mexicali power plants are excluded from conformity analysis because the DOE
permits are "[a]ctions that implement a foreign affairs function of the United States."  40 C.F.R. §
19  93.153(c)(2)(xviii).  For legal authority, federal defendants cite to an Executive Order, a State
Department statement published in the Federal Register, and a 30-year-old Second Circuit opinion.
20  [Fed. Defs. Memo. ISO Motion, at 13.]
        In granting summary judgment to the defendants, the Court does not find that DOE's permits
21  fall within EPA's exemption for a "foreign affairs function."  Defendants simply do not have enough
legal authority to sustain that position.  Furthermore, the Court's finding would run directly contrary
22  to the position of the Department of Energy, which maintained, in a 2003 memorandum, that
conformity analysis applied to the construction of power transmission lines across the international
23  border.  Office of Environmental Policy and Guidance, Compliance with the General Conformity
Regulations (2003), http://www.eh.doe.gov/oepa/guidance/caa/conformbrf.pdf, at 5.
24        (Of course, DOE's position also runs contrary to the position taken by EPA's revised guidance
document, which the Court adopts here.  However, the guidance document–revised earlier this
25  year–has been around a much shorter time than the foreign affairs exemption, which has existed in
EPA's regulations for over a decade.  Before the guidance document was revised, EPA had directed
26  agencies to interpret the conformity statute to "make their own decisions" on the applicability of the
conformity rule.  DOE obviously did not believe that transnational power lines were a foreign affairs
27  function.)
        In summary, the Court finds that the revised guidance document persuasively explains EPA's
28  regulations (and the CAA).  The Court does not find that the foreign affairs function applies to the
power plant emissions.

02cv513

1    seeks "to ensure informed agency action." Swanson v. U.S. Forest Serv., 87 F.3d 339, 343 (9th

2    Cir. 1996).  The dual goals of NEPA analysis are to "foster[] informed decision-making and

3    informed public participation." California v. Block, 690 F.2d 753, 767 (9th Cir. 1982).  The

4    statute "requires only that the agency take a 'hard look' at its decision, and not that environmental

5    concerns trump all others." Swanson, 87 F.3d at 343.  Where a plaintiff challenges a number of

6    specific points in an EIS, a court "need not 'fly-speck' the document and 'hold it insufficient on

7    the basis of inconsequential, technical deficiencies,' but will instead impose a 'rule of reason[.]'"

8    Id. (quoting Or. Envt'l Council v. Kunzman, 817 F.2d 484, 492 (9th Cir. 1987)).  If the EIS

9    "contains a reasonably thorough discussion," the court will approve the EIS even though it may

10   disagree with the agency's conclusion.  Nat'l Parks & Conservation Ass'n, 222 F.3d at 680

11   (internal quotation marks omitted).

12          In situations "where there is conflicting evidence in the record, the [agency's]

13   determination is due deference–especially in areas of agency expertise[.]" Id. at 682.  When facing

14   conflicting expert opinions, "an agency must have discretion to rely on the reasonable opinions on

15   its own qualified experts[.]" Morongo Band of Mission Indians v. Fed. Aviation Admin., 161 F.3d

16   569, 577 (9th Cir. 1998) (internal quotations omitted); see City of Carmel-By-The-Sea v. U.S.

17   Dep't of Transp., 123 F.3d 1142, 1151 (9th Cir. 1997) (NEPA does not require "unanimity of

18   opinion, expert or otherwise").

19   II.      Failure To Adequately Evaluate Alternatives

20          A.      Legal Standard

21          The EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives[.]"

22   40 C.F.R. § 1502.14(a).  "[T]he heart of the environmental impact statement . . . should present the

23   environmental impacts of the proposal and the alternatives in comparative form." Id. § 1502.14.

24   The goals of this presentation are "[1] sharply defining the issues and [2] providing a clear basis

25   for choice among options by the decisionmaker and the public." Id.; cf. § 1502.1 (requiring that

26   the EIS inform policymakers and the public of "reasonable alternatives" that would benefit the

27   environment.  This standard includes "[d]evot[ing] substantial treatment to each alternative

28   considered in detail" and briefly explaining the reason for eliminating any alternative from detailed

1   study.  Id. § 1502.14(a)-(b).

2        The agency must "[r]igorously explore and objectively evaluate all reasonable

3   alternatives."  Id. § 1502.14(a).  The court determines the spectrum of reasonable alternatives

4   based on the agency's statement of the purpose and need for the proposed action.  Westlands

5   Water Dist. v. U.S. Dep't of the Interior, 376 F.3d 853, 866 (9th Cir. 2004).  In this case, DOE's

6   purpose and need were "to determine whether it is in the public interest to grant Presidential

7   permits . . . for the . . . transmission lines. . . . In determining whether a proposed action is in the

8   public interest, DOE considers the impact of the proposed action on the environment and on the

9   reliability of the U.S. electric power supply system."  [FEIS, Vol. 1, at S-10.]

10       An agency does not have to consider "every conceivable permutation" of a given

11  alternative for the EIS evaluation to be adequate.  Westlands, 376 F.3d at 871.  The failure to fully

12  analyze specific alternatives does not make the range of alternatives unreasonable, especially

13  where the agency conducts a "thorough public debate" by directly responding to comments

14  proposing the alternatives that are not fully analyzed.  Id. at 870-72.

15       *B.*     *Analysis*

16            1.     DISCUSSION OF ALTERNATIVE TECHNOLOGIES

17       Each power plant currently relies on a "wet cooling system," which uses exclusively water

18  to condense the steam generated by the operation of the turbines.  An alternative method of

19  condensing steam is to blow air across it (i.e., a "dry cooling system").  [D-809, at 10.]  In the

20  section on alternative technologies, the FEIS considered the possibility of retrofitting one or both

21  power plants with a "wet-dry cooling system" that would combine a wet cooling system with a dry

22  cooling system.  [See FEIS, Vol. 1, at 2-37–2-40.]  The discussion addressed the advantages of dry

23  cooling, including reductions in the amount of water used and waste generated.  [Id., at 2-38.]  It

24  also addressed the disadvantages of dry cooling, including a decrease in power plant efficiency.

25  [Id.]  The FEIS specifically considered a wet-dry cooling system that would rely exclusively on

26  dry cooling up to an ambient temperature of eighty to ninety degrees Fahrenheit; above that point,

27  the system would begin to use wet cooling.  [Id. at 2-39.]  Above ninety degrees, the plant would

28  use exclusively wet cooling.  [Id.]  The retrofit would cost about $75 million.  [Id.]

1    Plaintiff objects the FEIS did not consider a different design for the wet-dry cooling system

2    that would have saved more money and water.[19]  Specifically, plaintiff proposed a wet-dry cooling

3    system that would have cost $30 million.  [D-0743, at 5.]  Also, according to plaintiff's proposed

4    design, the power plants would only use one hundred percent wet cooling "on peak temperature

5    days."  [Id. at 4.]  By making use of dry cooling above ninety degrees, the power plants would be

6    able to save more water than if they stopped using dry cooling at ninety degrees.  Since a wet-dry

7    cooling system is, according to plaintiff, "the only alternative that would reduce or eliminate

8    adverse impacts to water resources," plaintiff argues the FEIS's discussion of wet-dry cooling is

9    inadequate because it did not consider another proposed design that would have saved more

10    money and water.  [Pl. Reply ISO Motion, at 37.]

11    The Court finds dispositive the FEIS's acknowledgment of Powers's comments for the

12    record and direct response to those comments.  Identifying wet-dry cooling as a "Key Issue," the

13    FEIS specifically references one commenter's "recommendation . . . that the EIS should analyze a

14    parallel wet-dry cooling technology that would run primarily in dry mode and only be

15    supplemented with wet cooling on the hottest days of the year, resulting in a 90% reduction in

16    water use by the plants."[20]  [Vol. 2, at 3-5.]  In this section, the FEIS goes on to say that the

17    agencies "consider[ed] these comments and the associated technical submittals."  [Id.]  It then

18    announces DOE's conclusion: "a parallel wet-dry system that operates primarily in dry mode with

19    only supplemental wet cooling would be an infeasible alternative."  [Id.]  The FEIS then lists

20    reasons to support its conclusion: (1) the power plants have wastewater treatment plants

21    ("WTPs"), (2) the WTPs need a constant flow of water through their bioreactors, and (3) the

22    climate in Mexicali is hot.  [Id.]  Based on its reasoning, DOE concluded "the only reasonable

23    alternative" was the wet-dry cooling system design discussed in over four pages in the FEIS.  [Id.;

24

25    [19] Plaintiff also claims that the FEIS should have considered the smaller-size system (in terms
     of the number of cooling cells) that Powers submitted for the record.  In his declaration, Simoes claims

26    the size of the dry-cooling design he submitted for the record is the same as Powers's proposed design.
     [Simoes Decla. ¶ 8.]  The FEIS does not appear to state the exact size of the dry cooling system

27    considered in its section on alternative technologies.

28    [20] Even though the FEIS does not cite Powers as the commenter in question, the FEIS is
     unmistakably referring to Powers's comments.

1  see Vol. 1, at 2-37–2-40.]

2      Another section of the FEIS (seventeen pages in all) is devoted exclusively to responding

3  to Powers's comments.  [Id., Vol. 2, 4-59–4-76.]  Within this section, the agencies "disagree with

4  the statement in [Powers's] comment that a 'highly effective parallel wet-dry cooling system,

5  designed to reduce water use more than 90% relative to the current wet-only design, could readily

6  be retrofitted to [the power plants].'"  [Id., at 4-63.]  The agencies concluded a 90% water

7  reduction "is not considered reasonable" in light of the need for a consistently high level of water

8  to sustain the bioreactors.  [Id., at 4-63–4-64.]  Instead, the agencies cite Simoes's submissions for

9  the propositions that (1) the temperatures in Mexicali are too hot to support a system relying

10  primarily on dry cooling and (2) the retrofit would cost two-and-a-half times what Powers

11  estimated.  [Id.]

12      These facts reveal a battle of the experts.  Both Powers and Simoes submitted documents

13  for the record.  The FEIS makes clear that the agencies actually read both experts' submissions and

14  found Simoes's submissions persuasive.  The agencies found Powers's submissions unreasonable,

15  and the FEIS explains why.  Clear Ninth Circuit precedent, applied to these facts, says the agencies

16  have done their job.  In a battle of the experts, "an agency must have discretion to rely on the

17  reasonable opinions of its own qualified experts[.]"  Morongo, 161 F.3d at 577 (emphasis added).

18  Whether this Court thinks Powers might be more persuasive is irrelevant. Nat'l Parks &

19  Conservation Ass'n, 222 F.3d at 680.  Nor are agencies required to consider alternatives they deem

20  unreasonable or infeasible.  Carmel-by-the-Sea, 123 F.3d at 1155.  The agencies conducted a

21  "thorough public debate" on wet-dry cooling systems by considering Powers's comments and

22  directly responding to them.  Westlands, 376 F.3d at 870, 872.  The agencies' failure to fully

23  analyze Powers's proposal does not render the EIS deficient.  Id. at 871.

24      In the FEIS's discussion of wet-dry cooling, the agencies also fulfilled their obligations

25  under applicable regulations.  In eliminating Powers's proposal from detailed study, the agencies

26  had to "briefly discuss the reasons for [its] having been eliminated."  40 C.F.R. § 1502.14(a)

27  (emphasis added).  The FEIS provided this discussion.  [Vol. 2, at 3-5; 4-63-64.]  Furthermore, the

28  agencies "[r]igorously explore[d] and objectively evaluate[d]" an alternative wet-dry cooling

1   system through an extensive discussion of the advantages, disadvantages, and logistics of

2   installing dry-cooling systems at the power plants.  [40 C.F.R. § 1502.14(a); FEIS, Vol. 1, at 2-

3   35–2-40.]  Finally, the agencies "present[ed] the environmental impacts of . . . th[is] alternative[]

4   in comparative form" in a summary chart that considered twelve different environmental impacts.

5   [FEIS, Vol. 1, at S-67–S-76.]

6                2.    ASSUMPTION OF POWER PLANTS IN OPERATION

7        In its July 9, 2003 Order remanding for preparation of NEPA documents, the Court ordered

8   the agencies not to "consider[] the interim operation of the transmission lines [or] the completion

9   of the construction[.]"  [Doc. No. 162, at 33.]  In the FEIS, the agencies explained their "belie[f]

10  that the court ruling to treat the transmission lines as having never been built does not extend to the

11  connected power plants."  [FEIS, Vol. 1, at S-2.]

12       Plaintiff alleges the agencies interpreted this Court's ruling incorrectly; plaintiff believes

13  the Court also instructed the agencies not to consider the construction of the underlying power

14  plants.  Therefore, based on this incorrect interpretation, the agencies inflated the cost of installing

15  the wet-dry cooling system because a retrofit is more expensive than installing the system from

16  scratch.

17       Even if the agencies' interpretation of the Court's ruling is correct, plaintiff argues the

18  agencies still violated the Court's prohibition because the cost estimates take into account the lost

19  income from shutting down the power plants during the retrofit.  The power plants lose income

20  during a retrofit because they cannot send electricity across the transmission lines authorized by

21  the DOE permits, and the agencies were prohibited from considering those transmission lines in

22  the FEIS.

23       The Court finds, first, that the agencies correctly interpreted the Court's July 9, 2003

24  Order.  The Court's instruction to the agencies does not include the words "power plant" anywhere

25  in the sentence.  The phrase "completion of the construction" appears immediately after "interim

26  operation of the transmission lines".  Therefore, "of the transmission lines" is implied after the

27  words "completion of the construction".

28       The Court finds, second, that the FEIS's passing references to lost power sales in

- 28 -

1   estimating the cost of the wet-dry cooling system retrofit did not violate the prohibition in this

2   Court's July 9, 2003 Order.  [See FEIS, Vol. 1, at 2-39 ($75 million "include[s] . . . the cost of lost

3   power sales during installation."]  As Baja's counsel explained at oral argument, the power plant

4   managers invested so much in building the plants that, even if they could not transmit electricity to

5   the United States, the managers would look for other opportunities to transmit electricity.  [Trans.,

6   at 90:4-14.]  During portions of the retrofit, however, the power plants would be totally shut down,

7   and could not provide electricity anywhere.  Therefore, because the agencies properly assumed the

8   completed construction of the power plants when drafting the FEIS, they could also consider the

9   power plants' inability to sell power to any customer while shut down during the retrofit.

10  Furthermore, although the FEIS includes the lost power sales in its $75 million estimate, it cites a

11  document in the record which supports the proposition that the retrofit would cost more than $75

12  million even without considering lost sales.[21]  [D-809, at 16.]  The agencies did not violate this

13  Court's order in their adequate analysis of the wet-dry cooling alternative.

14  III.    Failure To Ensure the Scientific Accuracy of Relied Upon Information

15          A.      Legal Standard

16          To ensure scientific accuracy, an EIS "shall identify any methodologies used and shall

17  make explicit reference by footnote to the scientific and other sources relied upon for conclusions

18  in the statement."  40 C.F.R. § 1502.24.  The "high quality" information in the EIS must include

19  "[a]ccurate scientific analysis [and] expert agency comments."  Id. § 1500.1(b).  However, NEPA

20  review "must concentrate on the issues that are truly significant to the action . . . , rather than

21  amassing needless detail."  Id.  In the FEIS specifically, "[t]he agency shall discuss . . . any

---

22

23          [21] The relative unimportance of lost power sales in the overall cost estimate distinguishes these
    facts from a case in which the Ninth Circuit found the evaluation of alternatives inadequate where the
    agency relied on an inaccurate market projection in developing its range of alternatives.  Natural Res.

24  Def. Council v. U.S. Forest Serv., 421 F.3d 797, 813-14 (9th Cir. 2005).  In that case, a separate
    federal statute required the Forest Service to consider the market demand for timber in developing its

25  resource plan for the Tongass National Forest.  Id. at 801.  The Forest Service had erroneously
    doubled its market projection for timber because it had misinterpreted economic projections, and

26  acknowledged such an error throughout the litigation.  Id. at 800 & n.2.  Here, by contrast, the
    consideration of lost power sales is, at best, a marginal consideration in the overall cost estimate for

27  retrofitting the plants.  Even without considering lost sales, the retrofit could cost more than $75
    million.  [D-809, at 16.]  The possibility of lost power sales had little or no effect on the range of

28  retrofit costs the agencies considered in analyzing the reasonability of alternative wet-dry cooling
    system designs.

responsible opposing view which was not adequately discussed in the draft statement and shall

indicate the agency's response to the issues raised." Id. § 1502.9(b).  Good science is consistent

with "NEPA's purpose of providing decision makers and the public with an accurate assessment of

the information relevant to evaluate" the proposed action.  Natural Res. Def. Council, 421 F.3d at

812.

Inaccurate economic information in an EIS gives rise to a NEPA violation if it "'impair[s]

the agency's consideration of the adverse environmental effects'" and "'skew[s] the public's

evaluation.'"  Id. at 811 (quoting Hughes River Watershed Conservancy v. Glickman, 81 F.3d 437,

446 (4th Cir. 1996)).

    *B.*    *Analysis*

Plaintiff begins with the argument that the FEIS used inconsistent assumptions to make

wet-dry cooling as unattractive as possible.  The FEIS allegedly based its cost estimate on an

extremely large plant design.  However, when analyzing the efficiency penalty,[22] the FEIS

allegedly considered a different, much smaller plant design, on par with the size of the design

proposed by Powers.

The Court finds that plaintiff's argument is based on an incorrect reading of the relevant

comment in the record.  Plaintiff asserts, "Simoes, on wh[om] DOE solely relied, assumed an

unprecedented high number of dry cooling cells as part of the retrofit."  [Pl.'s Memo. ISO Motion,

at 22-23.]  Specifically, plaintiff asserts that DOE developed its $75 million "inflated cost estimate

based on a parallel wet-dry cooling system with 144 cells[.]"  [Id. at 24.]  In fact, the Simoes

document cited by the FEIS says no such thing.  Instead, the document describes the 144-cell

system as "cost-prohibitive" and "not practical."[23]  [D-809, at 4, 12.]  The document then proceeds

---

[22] The efficiency penalty is the percentage reduction in plant efficiency due to the extra power needed to run the dry-cooling system.  The penalty increases as the outside temperatures get hotter. In the layperson's explanation provided by T-US at oral argument, "[W]ater cools better than air, and particularly in Mexicali, where it's hot, hot air just doesn't cool as well as colder water."  [Trans., at 108:14-16.]

[23] The mere fact the Simoes document devotes some attention to a 144-cell design does not transform the FEIS's reliance on other parts of the Simoes document into a NEPA violation. Plaintiff's skepticism of the assumptions behind the 144-cell design cannot form the basis of a NEPA violation when the Simoes document itself rejects that design.

02cv513

to consider the cost of a retrofit to the Mexicali plant by making comparisons to "Project Alpha," a

wet-dry cooling system being installed at another Sempra plant in an arid climate.  [Id. at 12, 16.]

Project Alpha is a thirty-cell system, the same size as the system Powers proposed.  [Simoes

Decla. ¶ 8.]  Therefore, contrary to plaintiff's allegations, the FEIS is not "entirely inconsistent" in

its estimates of costs and efficiency penalties.  [See Pl.'s Memo. ISO Motion, at 24.]  Both points

of analysis are based on a thirty-cell dry cooling system.

Plaintiff also strenuously objects to the following passage in the FEIS:

> A potential wet-dry cooling system design would use dry cooling to handle the entire cooling load up to an ambient temperature of 80 to 90˚F (27 to 32˚C).  Wet cooling would augment the dry system at temperatures above 80 to 90˚F (27 to 32˚C); 100% wet cooling could be used on days the temperature is above 90˚F (32˚C) to ensure maximum power output from the plants (Powers 2004b).  The analysis of impacts to water resources assumes that dry cooling will be used at temperatures up to 90˚F (32˚C).

[Vol. 1, at 2-39.]

Plaintiff objects, first of all, that the cited Powers document [D-0743] does not precisely

stand for the proposition the FEIS claims.  While the Powers document does propose exclusively

dry cooling up to a temperature of eighty to ninety degrees, and while the document also says that

wet cooling augmentation would begin at these temperatures, a close reading reveals that Powers

did not propose exclusively wet cooling above ninety degrees.  Instead, Powers stated, "100

percent wet cooling could be used on peak temperature days to ensure maximum power output

from the plants."  [Id., at 4-5.]  Explained another way, the FEIS substituted the words "on days

the temperature is above 90˚F (32˚C)" where the Powers document said "on peak temperature

days."  By the phrase "peak temperature," Powers meant some temperature hotter than ninety

degrees; elsewhere in the Powers document, a chart shows that dry cooling could accomplish at

least seventy-five percent of the cooling even when the outside temperature is as hot as one

hundred degrees.  [D-0743, at 4, 27.]

---

Plaintiff insists the FEIS does rely on the 144-cell design because the FEIS says seven acres of land would be required to build the dry cooling system.  Analyzing the FEIS more closely, it says the cooling retrofit "would require an area as much as about 7 acres[.]"  [Vol. 1, at 2-39 (emphasis added).]  This sentence does not commit the FEIS to analyzing a dry cooling system of a particular size; it merely stands for the proposition that dry cooling systems are difficult to install because they are large.

02cv513

1    Part and parcel of plaintiff's analysis is its criticism of the FEIS's climate data.  The FEIS

2    projects that exclusively dry cooling would be used thirty-seven percent of the time because the

3    high temperature is less than eighty degrees on thirty seven percent of the days in Imperial,

4    California.  Plaintiff disputes this conclusion because exclusively dry cooling could be used on

5    portions of hotter days when the temperature was below eighty degrees.[24]  If the FEIS had relied

6    on hourly climate data, rather than the maximum daily high temperature, plaintiff alleges the

7    agencies would have found exclusively dry cooling could be used a larger percentage of the time.

8    The gravamen of plaintiff's criticisms is that greater reliance on dry cooling means greater

9    water savings.  While the FEIS considers a parallel wet-dry cooling system that would bring about

10   a 56% reduction in water used by the power plants, plaintiff alleges that a 90% reduction could be

11   achieved if the FEIS (1) adopted all the specifications of the cooling system proposed in the

12   Powers document that the FEIS actually cites, and (2) used more precise climate data.  [Pl.'s Reply

13   ISO Motion, at 31-33.]

14   Plaintiff relies on three cases to support its argument about the inadequacy of the FEIS's

15   scientific analysis.  In Powell, the Forest Service violated NEPA by using a sedimentation model

16   that "was incomplete and ignored key variables."  395 F.3d at 1031.  Relying heavily on the

17   model, the agency did not disclose the model's shortcomings until its decision was challenged on

18   administrative appeal.  Id. at 1032.

19   Applying Powell, the Ninth Circuit found the Forest Service's soil quality analysis violated

20   NEPA where the agency had failed to observe soil conditions directly in the areas affected by

21   agency action.  Ecology Center, Inc. v. Austin, 430 F.3d 1057, 1068-71 (9th Cir. 2005).  Although

22   the agency pointed to informal field reports in the record indicating direct soil observation, the

23   court refused to credit those reports because "there [was] no indication in the draft EIS or final EIS

24   that the [agency] actually consulted and relied upon any of the field reports it now cites when it

25   was making its selection[.]"  Id. at 1071.  The Ninth Circuit further refused to defer to the agency's

26   expertise because one of the agency's own experts criticized the agency's analysis on the record.

27

28   [24] This is to say that, on days when the maximum temperature is between eighty and ninety
     degrees or even greater than ninety degrees, the temperature is still less than eighty degrees during
     some hours of the day.

1   Id. at 1069 n.13, 1070 & n.15.

2         Another NEPA violation in Austin was the agency's failure to address the scientific

3   uncertainty regarding the effects of thinning old-growth forest stands on species dependent on old-

4   growth habitat.  Id. at 1063.  The EIS assumed without discussion that thinning the forests would

5   benefit the species and did not meaningfully address the uncertainty surrounding that assumption.

6   Id. at 1065.  The agency could have avoided a NEPA violation if it had explained why further

7   study on this issue was "'not necessary or feasible.'"  Id. (quoting Seattle Audobon Soc'y v. Espy,

8   998 F.2d 699, 704 (9th Cir. 1993)).

9         The third NEPA violation in Austin was the agency's reversal on whether eliminating

10  newly created post-fire habitat would adversely affect a woodpecker species dependent on that

11  habitat.  Id. at 1067.  Before a fire took place in a national forest, the agency concluded that

12  eliminating post-fire habitat could result in the federal listing of the woodpecker.  Id.  After the

13  fire, the agency then reversed course and concluded that eliminating the habitat would probably

14  not result in federal listing.  Id.  The Ninth Circuit found that the agency had not provided the

15  public with any underlying data, and refused to accept the agency's unsupported conclusion.  Id. at

16  1068.

17        In the third case cited by plaintiff, the Ninth Circuit found a NEPA violation for inaccurate

18  economic information that "inflated the economic benefits and discounted the environmental

19  impacts of the [p]lan."  Natural Res. Def. Council, 421 F.3d at 811.  The agency misinterpreted a

20  study on market demand projection for timber and based its decision on an estimated demand

21  twice the size of the actual demand.  Id. at 802.

22        The Court finds these precedents distinguishable.  The agencies in this case did not rely on

23  factually inaccurate information, nor did they reverse their position during the NEPA process.

24  Instead, the agencies selected one expert's opinion (Simoes) over another expert (Powers).  The

25  agencies' reliance on the Simoes document is unmistakable, as the FEIS cites to it during the

26  discussion of why the agencies did not adopt Powers's proposal.  [FEIS, Vol. 2, at 4-63–4-64.]  In

27  the guise of an allegation the FEIS used scientifically inaccurate information, plaintiff seeks to

28  relitigate in this Court the battle it lost within the NEPA review process.  Plaintiff tries to

1   convince the Court to doubt the reliability of the Simoes document, often by directing the Court's

2   attention to the conflicting Powers documents the agencies have already rejected.

3          To the extent NEPA obligated the agencies to answer Powers's competing perspective, the

4   agencies fulfilled that obligation.  See 40 C.F.R. 1502.9(b) (FEIS "shall discuss . . . any

5   responsible opposing view which was not adequately discussed in the draft statement and shall

6   indicate the agency's response to the issues raised.")  As a specific example, plaintiff insists the

7   FEIS's estimated efficiency penalty is too large, in light of the California Energy Commission's

8   estimated penalty at a purportedly similar power plant.  [Pl. Reply ISO Motion, at 28.]  Powers

9   presented these objections to the agencies through his comments reprinted in the FEIS.  [Vol. 2, at

10  4-61–4-62.]  The agencies responded to Powers's comments by adding a sentence to the FEIS

11  estimating a smaller efficiency penalty for the entire power plant.  [See id., Vol. 1, at 2-38–2-39

12  ("For a typical combined-cycle power plant where the steam cycle accounts for about one-third of

13  the total capacity, overall plant efficiency would be reduced from between 3 to 5%.").]  In

14  reducing the estimated efficiency penalty, the agencies were not obligated to reduce by the full

15  magnitude suggested in plaintiff's comment.  The Simoes Declaration, citing accurately to the

16  record, establishes that the California Energy Commission analyzed a power plant with a much

17  smaller steam turbine than the one at issue here.  [Simoes Decla. ¶ 13 (citing D-0469, at 5).]

18         The Court finds the agencies' NEPA analysis did not undermine informed decision-making

19  because the agencies determined that the environmental impacts of the proposed action fell within

20  acceptable limits.  Focusing specifically on water impacts (the area which, in plaintiff's view, most

21  clearly manifests the FEIS's purported scientific inaccuracies), the agencies found the Salton Sea

22  would reach critical levels of salinity in about thirty-six years, even if the agencies took no action.

23  [D-1085, at 4.]  Because the agencies took the proposed action, the Salton Sea will reach this

24  critical level four days earlier.  [Id.]  With respect to the New River, the ROD recognized that the

25  proposed action would bring about the greatest increase in its salinity, and that a wet-dry cooling

26  system would have the least impact on its salinity.  [Id.]  In announcing the adoption of the

27  proposed action, the ROD explained that the salinity increase from any of the alternatives

28  considered would neither prevent the New River from meeting its water quality objective nor

1   exceed the salinity limits of its wetland plants.  [Id.]

2   Explained another way, the ROD said that wet-dry cooling technology has marginally

3   fewer environmental impacts on water resources[25] than the proposed action.  However, the

4   agencies did not rely merely on the "negligible" magnitude of the differences in those impacts

5   when they adopted the proposed action.  [Id., at 7.]  The ROD also relied on the fact that all

6   alternatives, including the proposed action, had "small impacts" on the environment, in an absolute

7   sense.  [Id..]  The gravamen of the ROD's discussion of impacts on water resources is that the

8   environmental impacts of the proposed action are acceptable; therefore, the agencies elected not to

9   adopt alternatives with fewer environmental impacts.  In light of this discussion, it would have

10  made no difference if the agencies had used different climate data to conclude that dry cooling

11  would be used more often.  The potential extra water savings would not have affected the

12  agencies' analysis because the agencies were satisfied with the water resource impacts of the

13  proposed alternative.[26]

14  Because of these small environmental impacts, the fact the retrofit might have cost $30

15  million rather than $75 million did not compromise the agencies' consideration of the

16  environmental impacts.[27]  As plaintiff implicitly acknowledges, the DOE ROD rejected wet-dry

17  cooling without considering costs.  [See Pl. Reply ISO Motion, at 37-38.]  Although the BLM

18  ROD did mention a consideration of costs, the Court agrees with federal defendants' interpretation

19  of the agencies' decision:  "any water savings at the power plants . . . clearly would not justify the

20  expense of retrofitting the power plants, even accepting [p]laintiff's estimate of $30 million per

21

22  [25] The Court makes its findings even without reaching the ROD's analysis on the greater
     environmental impact that wet-dry cooling would have on air quality.  [D-1085, at 7.]

23  [26]As for the other impacts on water resources mentioned in the FEIS (e.g., the impacts on

24  aquatic species and pilot wetlands), the agencies fulfilled their obligations merely by listing and
     discussing those impacts.  See Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350

25  (1989) (NEPA does not prevent agencies "from deciding that other values outweigh the environmental
     costs.")

26  [27] Plaintiff asserts that the FEIS opaquely withheld Powers's proposal of a retrofit that would

27  cost $30 million: "the FEIS does not disclose or reconcile Mr. Powers' expert written comments that
     . . . a parallel wet-dry retrofit on the plants would cost approximately $30 million per plant[.]"  [Pl.

28  Reply ISO Motion, at 29.]  This assertion is wrong.  In reprinting Powers's unredacted comments for
     the record, the FEIS includes Powers's statement, "the total installed cost of a 30-cell ACC retrofit
     would be considerably less than $30 million."  [FEIS, Vol. 1, at 4-62.]

1  plant." [Fed. Defs. Reply ISO Cross-Motion, at 14.]

2       In addition to the allegations discussed here, plaintiff alleges a host of other scientific

3  inaccuracies in the FEIS, e.g., the frequency of "duct firing," the time it would take to install the

4  wet-dry cooling system, and the steam flow rates at other power plants. The Court finds none of

5  these to be availing.  In Swanson, the Ninth Circuit upheld a grant of summary judgment for the

6  agency where the plaintiff had challenged "the accuracy of specific points" in the record.  87 F.3d

7  at 344.  The court did not analyze those specific points in detail because it refused to "fly-speck"

8  the EIS in light of its "comprehensive discussion" of the proposed actions and their environmental

9  impacts.  Id. at 343-44.  Applied to these facts, the Court finds it sufficient that the FEIS

10  comprehensively discussed the environmental impacts of various proposed alternatives, and

11  explained why it did not consider Powers's proposal to be a reasonable alternative.[28]  Nor should

12  this comprehensive discussion be found inadequate merely because it cites Powers for a

13  proposition with which Powers and plaintiff disagree.[29]

14       The Court further finds the agencies' NEPA analysis did not undermine informed public

15  participation.  Any member of the public who read the FEIS learned of Powers's proposal because

16  the entire proposal was printed verbatim in the FEIS.  [See FEIS, Vol. 2, at 4-61–4-63.]  The

17  public received further information about the agencies' response to Powers's proposal because that

18  response appeared directly after the verbatim printing of Powers's comments.  [Id., Vol. 2, at 4-

19  63–4-64.]  More than four months transpired between the FEIS's publication and the issuance of

20  the ROD in the Federal Register.  [Compare D-1069 (FEIS available to public by December 10,

21  2004) with D-1085 (ROD issued on April 18, 2005).]  During that time, interested

22  parties–including the Imperial County Air Pollution Control District, EPA, and the permit

23

24       [28] This comprehensive discussion should not be found inadequate merely because, e.g., the
FEIS says the steam flow rate at T-US's power plant is more than ten times greater than the rate at a
25  parallel-cooling plant in Cedar Rapids, Iowa, when the rate is only four to seven times greater.  [See
Pl. Reply ISO Motion, at 35.]
26

27       [29] The Court agrees with federal defendants that "[t]he wet-dry cooling alternative [for which
the FEIS cites Powers] includes basic features suggested by [p]laintiff."  [Fed. Defs. Reply ISO
Motion, at 12.]  The FEIS and Powers both agree that dry cooling would be used exclusively up to an
28  outside temperature of eighty to ninety degrees. They likewise agree that wet cooling would be used
exclusively on hotter days.  They simply disagree about the definition of a hot day.

02cv513

applicants, but not plaintiff–actually submitted comments on the FEIS for the record.  [D-1073; D-1073a; D-1074; D-1075.]

IV.     Inadequate Analysis of Mitigation Measures

    *A.     Legal Standard*

An agency's ROD must "[s]tate whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not."  40 C.F.R. § 1505.2(c); see Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin., 126 F.3d 1158, 1187 (9th Cir. 1997) (allowing the satisfaction of this requirement by adequate analysis in the EIS).  The agency must take a "hard look" at mitigation "in sufficient detail to ensure that environmental consequences have been fairly evaluated."  Neighbors of Cuddy Mountain v. U.S. Forest Serv., 137 F.3d 1372, 1380 (9th Cir. 1998) (quoting Robertson, 490 U.S. at 353).  Merely listing mitigation measures is not enough.  Id.  Nor can the agency typically get by with "broad generalizations and vague references to mitigation measures."  Id. at 1381; see Carmel-By-The-Sea, 123 F.3d at 1154 (noting that the absence of "a reasonably thorough discussion of mitigation measures . . . would undermine the action-forcing goals of [NEPA]").  However, the agency can "describe[] in general terms and rely on general processes, not on specific substantive requirements," especially when actual adverse effects are uncertain and the EIS extensively analyzes the potential effects.  Okanogan Highlands Alliance v. Williams, 236 F.3d 468, 477 (9th Cir. 2000).

In Cuddy Mountain, the Forest Service approved a timber sale that would increase sedimentation in three creeks to the detriment of redband trout.  137 F.3d at 1380.  The Ninth Circuit held the discussion of mitigation measures inadequate under NEPA because the Forest Service did not even consider mitigation measures for the particular creeks and instead expected that undefined mitigation measures elsewhere in the forest might compensate for the harms to the creeks.  Id.  The Ninth Circuit also faulted the agency for failing to estimate how effective the mitigation measures would be if adopted, or to reasonably explain why mitigation would not be possible.  Id.

The procedural requirement to discuss mitigation measures, however, is distinct from "a

1   substantive requirement that a complete mitigation plan be actually formulated and adopted[.]"

2   Robertson, 490 U.S. at 352.  In Robertson, the Supreme Court held that agencies have no

3   obligation to adopt mitigation measures.  Id. at 353.

4          *B.      Analysis*

5          The DOE ROD identified the adoption of off-site mitigation measures, including road

6   paving, as the environmentally preferable alternative.  [D-1085, at 6.]  Despite that identification,

7   DOE did not select the mitigation measures alternative for the following reasons:

8          Whether, and the extent to which, these measures can in fact be implemented,
       however, can depend in part on factors outside the [permit] applicants' control.

9      Most of the mitigation measures would require some degree of approval and
       cooperation from local and state agencies for their implementation.  Also, existing

10     local agreements could diminish the positive effect of some of the measures.

11  [Id.]  Plaintiff faults this ROD because it "does not state why each individual, practicable measure

12  to mitigate impacts of the selected alternative was not adopted."  [Pl. Memo. ISO Motion, at 32.]

13         By confining its arguments to the ROD, plaintiff would seek to prevent the Court from

14  considering the simply exhaustive discussion of mitigation measures in the FEIS.  See Bonneville

15  Power Admin., 126 F.3d at 1187 (sufficient analysis in EIS satisfied 40 C.F.R. § 1505.2(c), which

16  facially requires discussion of mitigation in ROD).   One reason for the long list of measures is that

17  DOE affirmatively contacted plaintiff to solicit its suggestions about off-site mitigation that DOE

18  could consider.  [FEIS, Vol. 1, at 2-40, 4-62.]  That discussion is particularly impressive with

19  respect to water resources, because the FEIS individually describes each of five measures, explains

20  arguments against its adoption, and, at the end, summarizes the entire slate of measures.  [Id., Vol.

21  1, at 4-27–4-30.]

22         As for road paving, the FEIS does explain why that alternative was not adopted.  In the

23  short term, paving roads would have increased soil erosion and the deposit of sediments in nearby

24  water.  [Id., Vol. 1, at 4-30.]  Making remote areas easier to access "could result in adverse

25  impacts to current land use."  [Id., Vol. 1, at 4-86.]  Before road paving could even begin, agencies

26  would have to conduct a burdensome review to determine the impact on protected species and

27  cultural resources.  [Id., Vol. 1, at 4-73, 4-83.]  In addition, road paving would cost $430,000 per

28  mile.  [Id., Vol. 1, at 2-42.]

1    The agencies' FEIS in this case avoided the pitfalls of the EIS in <u>Neighbors of Cuddy</u>

2   <u>Mountain</u>.  There, the EIS did not consider mitigating measures for the creeks actually affected by

3   the agency's action, did not estimate the effectiveness of mitigation measures if they were adopted,

4   and relied on "broad generalizations and vague references."  137 F.3d at 1381.  Such criticisms

5   ring hollow against this FEIS, which considers mitigation measures in twelve different areas of

6   environmental impacts, and then summarizes its findings in an easily comprehensible chart.

7   [FEIS, Vol. 1, at 2-44–2-53.]

8    By claiming that the agencies must provide an itemized explanation on mitigation

9   measures, plaintiff has overstated what the law requires.  Here, the DOE ROD concluded the

10  proposed action had "low potential environmental impacts[.]"  [D-1085, at 7.]  Where

11  environmental impacts are minimal or speculative, an EIS may "focus on broad mitigation

12  measures."  <u>Nat'l Parks & Conservation Ass'n</u>, 222 F.3d at 681.  But, even if the plaintiff had

13  correctly stated the law, this FEIS satisfied such a high standard.  When the FEIS discusses

14  mitigation measures so extensively, plaintiff cannot make out a NEPA violation by focusing

15  narrowly on the ROD.

16                                           **CONCLUSION**

17   Because each permit is a separate federal action, and because EPA's interpretation of its

18  regulations does not require DOE to consider emissions from the Mexicali power plants in its

19  conformity analysis, the Court **DENIES** plaintiff's motion for summary judgment on the first

20  cause of action.  The Court **GRANTS** all defendants' cross-motions on this cause of action.

21   Because the agencies rigorously explored and objectively evaluated all reasonable

22  alternatives and briefly discussed the reasons for not considering other alternatives, and because

23  the agencies properly interpreted this Court's Order remanding for more NEPA review, the Court

24  **DENIES** plaintiff's motion for summary judgment on the third cause of action.  The Court

25  **GRANTS** all defendants' cross-motions on this cause of action.

26   Because the agencies found minimal environmental impacts from the proposed action and

27  responded to Powers's comments in the record, the NEPA analysis did not undermine informed

28  decision-making or informed public participation.  Therefore, the Court **DENIES** plaintiff's

1    motion for summary judgment on the fourth cause of action.  The Court **GRANTS** all defendants'

2    cross-motions on this cause of action.

3          Because the FEIS thoroughly discusses mitigation measures, including some proposed by

4    the plaintiff, the Court **DENIES** plaintiff's motion for summary judgment on the fifth cause of

5    action.  The Court **GRANTS** all defendants' cross-motions on this cause of action.

6          Because of this Court's finding that neither NEPA nor CAA were violated under the first

7    five causes of action, the Court **DENIES** plaintiff's motion for summary judgment on the sixth

8    cause of action.  The Court **GRANTS** all defendants' cross-motions on this cause of action.

9          Some paragraphs of the First Powers Declaration, Simoes Declaration, and Second Powers

10   Declaration fall within the established exceptions for admitting extra-record evidence.  Therefore,

11   the Court **GRANTS IN PART** and **DENIES IN PART** all defendants' motions to strike the First

12   and Second Powers Declarations.  The Court **DENIES** T-US's motion to voir dire Powers.  The

13   Court also **GRANTS IN PART** and **DENIES IN PART** plaintiff's motion to strike the Simoes

14   Declaration.

15         The Court **DENIES AS MOOT** all defendants' motions to strike the Schade Declaration.

16         This Order hereby **CONCLUDES** the litigation in this case.

17         **IT IS SO ORDERED.**

18

     **DATED:  November 30, 2006**

19

20

21   _____
     **IRMA E. GONZALEZ, Chief Judge**
22   **United States District Court**

23

24

25

26

27

28

02cv513